STATE OF CONNECTICUT *v.* CHARLES WARHOLIC
(SC 17289)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued November 30, 2005—officially released May 30, 2006

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Terence Mariani*, senior assistant state's attorney, for the appellant (state).

*Richard Emanuel*, for the appellee (defendant).

*Opinion*

VERTEFEUILLE, J. Upon our grant of certification, the state appeals from the Appellate Court's judgment reversing the conviction of the defendant, Charles Warholic, of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), and one count of risk of injury to a child in violation of General Statutes § 53-21. *State* v. *Warholic*, 84 Conn. App. 767, 854 A.2d 1145 (2004). The state claims that the Appellate Court improperly reversed the defendant's convictions due to prosecutorial misconduct. We agree,

and, accordingly, we reverse the judgment of the Appellate Court.

The Appellate Court opinion sets forth the following facts, which reasonably could have been found by the jury. "E[1] was born in 1986. In 1990, when E was four years old, his parents were divorced and his father moved out of their house. After the divorce, E lived with his mother, his two older sisters, L and B, and the defendant, who was his mother's boyfriend. In February, 1992, when E was five years old, his family and the defendant moved to a rented house in Watertown.

"According to E, the defendant began sexually assaulting him approximately one year after they moved to the rented house. E had a clear memory of the first incident of abuse. According to E, when his mother was out of the house, the defendant told him to come upstairs to a bathroom. Once upstairs, the defendant closed the bathroom door and told E to take his clothes off and to get into the shower. The defendant then stood naked in the shower with E and had E kneel beneath the shower and face him. At the behest of the defendant, E put his mouth on the defendant's penis and moved his head back and forth. That lasted two minutes until the defendant ejaculated. E then put his hands on and rubbed the defendant's penis. The entire incident lasted five minutes. E was instructed never to tell anyone about the incident.

"According to E, incidents similar to the first one occurred on a regular basis, approximately fifty to sixty times, until March or April, 1994. E testified that whenever he saw his mother pick up her blue notebook, he would go to his bedroom because he knew the defendant was going to sexually assault him. E's mother took

---

[1] In accordance with General Statutes § 54-86e, and the court policy of protecting the privacy of victims in sexual abuse matters, we decline to use the names of individuals involved in this appeal.

her book with her when she left the house as part of her routine.

"In March, 1999, E moved in with his father and his father's new wife, C, and her three children. C observed that during that time period, E was a quiet child who often misbehaved. In February, 2000, after E misbehaved, C told E that he would have to return to live with his mother. E begged her not to return him to his mother and eventually told her about the abuse by the defendant. E also told his father about the abuse. E and his father then gave statements to the police. The defendant was later arrested and charged accordingly.

"Howard Krieger, a psychologist and an expert in child sexual assault cases, testified at the trial. Krieger, who did not treat E, described the general symptoms of sexually abused children, including the delayed reporting of such abuse. The defendant and the victim's mother testified on the defendant's behalf. According to the victim's mother, E and the defendant had a normal relationship, and she never witnessed the defendant acting in an inappropriate manner toward E. She denied ever bringing a blue notebook with her to meetings and noted that she rarely left E home alone with the defendant. The defendant testified that while E was living with him, he baby-sat the children infrequently, and he denied E's claims of sexual assault.

"The state presented two rebuttal witnesses, J, a friend of the victim's mother, and E's sister, B, who both resided in the rented house. J testified that she observed the defendant and E on numerous occasions, and that E appeared withdrawn and afraid of the defendant. B testified that her mother was out of the house on a regular basis and would take her notebook with her to certain meetings that she attended." *State* v. *Warholic,* supra, 84 Conn. App. 769–71. Additional facts will be set forth as necessary.

The jury found the defendant guilty on both counts. The trial court rendered judgment in accordance with the jury's verdict. The defendant subsequently appealed from the judgment of conviction to the Appellate Court, claiming that he was deprived of his due process right to a fair trial as a result of prosecutorial misconduct. The Appellate Court determined that the prosecutor improperly: (1) expressed his personal opinion during closing and rebuttal argument as to the credibility of E, the defendant, and E's mother, who was called as a witness for the defendant; id., 774–77; (2) expressed his personal opinion of the defendant's guilt; id., 776; (3) appealed to the emotions of the jury during closing argument; id., 777–78; (4) during rebuttal argument made gratuitous remarks to elicit sympathy for E and appealed to the male jurors to identify with E; id., 779–80; (5) during cross-examination asked the defendant to comment on the veracity of E's testimony; id., 780–81; and (6) during cross-examination attacked the character of the defendant and E's mother. Id., 781–83. The Appellate Court concluded that these improprieties so infected the trial that they violated the defendant's due process right to a fair trial.[2] Id., 783–86. Accordingly, the Appellate Court reversed the judgment of the trial court and ordered a new trial. Id., 786. Thereafter, we granted the state's petition for certification to appeal,

[2] In his appeal to the Appellate Court, the defendant also claimed that the evidence was insufficient to establish his guilt beyond a reasonable doubt. *State* v. *Warholic*, supra, 84 Conn. App. 771. The Appellate Court concluded that there was sufficient evidence to establish the defendant's guilt beyond a reasonable doubt. Id., 771–73. This conclusion is not challenged on appeal. In addition, the defendant claimed that the trial court improperly overruled defense counsel's objections to two of the state's questions that the defendant contended were improper attempts to have him comment on the veracity of E's testimony. Id., 769. The Appellate Court did not reach this claim because the defendant's due process claim was dispositive, and this claim was not likely to arise on the retrial. Id., 769 n.1. The defendant raises this claim again in this court as an alternate ground to affirm the judgment of the trial court. See footnote 27 of this opinion.

limited to the following question: "Did the Appellate Court properly reverse the judgment of conviction because of prosecutorial misconduct?" *State* v. *Warholic*, 271 Conn. 935, 861 A.2d 512 (2004). This appeal followed.

## I

## PROSECUTORIAL MISCONDUCT

The state argues that the Appellate Court incorrectly determined that many of the prosecutor's comments during final arguments and questions during cross-examination were improper. Further, the state contends that the Appellate Court improperly determined that the misconduct deprived the defendant of a fair trial because it overstated the frequency and severity of the misconduct, and failed to give adequate weight to the trial court's curative instructions, the defendant's failure to object to most of the misconduct, and the fact that the jury asked to rehear all of E's testimony.

At the outset, we note that, although the defendant preserved a number of his claims of misconduct by way of objections or motions for mistrial, he did not preserve all of the claims of misconduct that he has raised on appeal. Nonetheless, we have recently stated that a defendant who fails to preserve claims of prosecutorial misconduct need not "seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). The reason for this is that the defendant in a claim of prosecutorial misconduct must establish that the "prosecutorial misconduct was so serious as to amount to a denial of due process . . . ." (Internal quotation marks omitted.) Id., 573. In evaluating whether the misconduct rose to this level, we consider the factors enumerated by this court in *State* v. *Wil-*

*liams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). *State* v. *Stevenson*, supra, 572–73. These factors include the extent to which the misconduct was invited by defense conduct or argument, the severity of the misconduct, the frequency of the misconduct, the centrality of the misconduct to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case. Id., 573. The consideration of the fairness of the entire trial through the *Williams* factors duplicates, and, thus makes superfluous, a separate application of the *Golding* test. Id., 573–74.

"This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . [Thus], the fact that defense counsel did not object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Internal quotation marks omitted.) *State* v. *Ancona*, 270 Conn. 568, 593, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005).

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness

of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question . . . . As we have indicated, our determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, with due consideration of whether that misconduct was objected to at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Ancona*, supra, 270 Conn. 595–96.

## A

### Alleged Misconduct During Closing and Rebuttal Arguments

The state claims that the Appellate Court incorrectly determined that the prosecutor committed misconduct in the following three categories: (1) expressing his personal opinion regarding witness credibility and the defendant's guilt; (2) appealing to the emotions of the jurors; and (3) injecting extraneous matters into the trial in order to elicit the jury's sympathy for E. We consider each of these three categories of misconduct in turn.

### 1

### Expression of Personal Opinion Regarding Witness Credibility and the Defendant's Guilt

The state claims that the Appellate Court improperly determined that the prosecutor, on nine occasions during closing and rebuttal arguments, expressed his personal opinion as to the credibility of witnesses and the defendant's guilt. The state argues that these statements were not expressions of the prosecutor's personal opinions, but were proper arguments to the jury based on the evidence and the jury's common sense and experience. We agree.

"It is well settled that, in addressing the jury, [c]ounsel must be allowed a generous latitude in argument,

as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of the argument. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"The parameters of the term zealous advocacy are also well settled. The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 712–13, 793 A.2d 226 (2002).

The state first argues that the Appellate Court incorrectly identified five statements as improper expressions of the prosecutor's opinion of E's credibility because, in each instance, the prosecutor was arguing that the evidence and the jurors' common sense and life experience revealed that E lacked a motive to lie. The following are the first five statements that are at issue. Twice during the state's closing argument and once during its rebuttal, the prosecutor stated that there was no reason for E to have made these allegations unless he was telling the truth.[3] In addition, the prosecu-

---

[3] For the sake of clarity we will italicize the portion of the prosecutor's statements that the defendant challenges as improper. The prosecutor first stated: "And those of you who have experiences talking to children or even drawing on your own experiences growing up, think back to your childhood,

tor, during closing argument, argued that it was a "stretch to think that E is kind of a—a mastermind behind making this up . . . ."[4] Finally, during rebuttal argument, the prosecutor argued that "[t]he kid who was molested came in here and faced you all and said it."[5]

especially the men I'd ask. How difficult would it have been as a [thirteen] year old boy to say that? Think about the things you can talk to your father about. I mean, performing oral sex on a grown man. That is so far out of the ballpark about what you can talk about to your father, I would argue, that you should consider that when you decide on credibility. Why would— *Why would [E] bring that upon himself unless it were true?*" Second, the prosecutor stated: "And again, E had to balance, 'How bad is it going to be if I say something? How bad am I going to feel? How ashamed am I going to feel?' That was his word. Ashamed because he thought he was gay. Why would—Why would he bring that on himself? If he made this up, 'I'm going to say something that in my own heart I think might mean I'm gay and I have to explain that to my father and to the police.' *There is no rational or reasonable explanation for what he said other than it's the truth.*" Finally, the prosecutor stated toward the end of his rebuttal argument: "And again, final time I'll say it, *there is only one explanation for why* a young boy, [thirteen] years old, would say something like this and the only reason he would say it *is because it's true.*"

   [4] The prosecutor's full statement, in context, is as follows: "So don't think that because the abuse isn't disclosed for years that that somehow weakens the state's case. Listen and recall the testimony of . . . Krieger. Everything that [E] did in terms of his disclosure, who he told, that was all consistent with what the doctor has seen in the hundreds if not thousands of people that he has treated.

   "He was offered as an expert not on whether or not [E's] telling the truth, but on how people generally act and it's a pretty far stretch to think that [E] is kind of a—a mastermind behind making this up and he also must have done some research to know what the typical symptoms are and the delay in disclosure and, you know, he held it inside and then came out at the right time and is tricking everybody. It just doesn't make any sense. There's only one explanation in this case that makes sense and as difficult as it is to understand that it happens, it's that the defendant did exactly what he's accused of."

   [5] The prosecutor's full statement, in context, is as follows: "Of course there's no evidence—physical evidence. [E] kept [the sexual assaults] secret for seven or eight years.

   "Look at the evidence from . . . Krieger about the pattern of abuse. That's evidence. That explains what happened in this case and why it happened. I mean, was I supposed to go or were the police supposed to go and try and get fingerprints from the shower from . . . seven or eight years ago? Whoev-

This court previously has concluded that the state may argue that its witnesses testified credibly, if such an argument is based on reasonable inferences drawn from the evidence. See *State* v. *Burton*, 258 Conn. 153, 169–70, 778 A.2d 955 (2001). Specifically, the state may argue that a witness has no motive to lie. Id., 170; see also *State* v. *Bermudez*, 274 Conn. 581, 592–93, 876 A.2d 1162 (2005) (prosecutor may argue from evidence that state's witnesses had no motive to lie), after remand, 95 Conn. App. 577, 897 A.2d 661 (2006); *State* v. *Ancona*, supra, 270 Conn. 607 ("[i]t is permissible for a prosecutor to explain that a witness either has or does not have a motive to lie"); *State* v. *Ceballos*, 266 Conn. 364, 380–81, 832 A.2d 14 (2003) (state's closing argument was not improper because it discussed complainant's lack of motive to lie). In addition, jurors, in deciding cases, "are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to a jury's common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *Ceballos*, supra, 402; see also *State* v. *Rogelstad,* 73 Conn. App. 17, 30, 806 A.2d 1089 (2002).

Turning first to the prosecutor's three statements in which he argued that there was no reason for E to have made these allegations unless he was telling the truth, we conclude that these were proper arguments that E had no motive to lie. The first statement urged the jury to consider, in its assessment of E's credibility, why he would put himself in a position to have to explain to

er's living in the house now, can you step aside so we can try and do some investigation? Of course, there's no physical evidence in a case like this.

"What better evidence could you hope for than the eyewitness testimony of a [sixteen] year old boy with nothing to gain by coming in here and telling the truth. How's that for some evidence? The kid who was molested came in here and faced you all and said it. That's pretty powerful."

his father that he had performed oral sex on an adult male. This statement properly called on the jury to use its common sense and experience to determine that E's testimony was truthful. The second statement similarly argued that the jury, in its determination of E's credibility, should consider E's testimony that he was ashamed of these acts and that he felt that performing these acts meant he was homosexual. This was also proper argument because it asked the jury to make reasonable inferences from the evidence that would bolster E's credibility. In the third statement, the state argued that the only explanation for why a thirteen year old boy would make this allegation is because it was true. As the prosecutor made this remark toward the end of his rebuttal argument, it must be read in the context of the entire closing and rebuttal arguments. When read in this context, this statement was simply a reiteration of the argument that the state made throughout its summation: the evidence, common sense, and life experience all indicated that E lacked a motive to lie. Accordingly, the third statement was also a proper argument.

We also conclude that the fourth statement, in which the prosecutor argued that it was a "stretch to think that [E] is kind of a—a mastermind behind making this up," was proper. When read in context, the essence of the state's argument was that the consistency between E's actions and Krieger's testimony about the common behavioral patterns of sexually abused children supported E's credibility. Thus, this argument was proper because it was based on reasonable inferences drawn from the evidence. Although the prosecutor's comment that E would have to have been a mastermind bordered on hyperbole, we have previously stated that not "every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 747, 850 A.2d 199 (2004).

The defendant argues that the fourth statement was improper under this court's decision in *State* v. *Alexander*, 254 Conn. 290, 305, 755 A.2d 868 (2000). The defendant's reliance on *Alexander* is misplaced, however, because the comment at issue in that case is distinguishable from the statement at issue in the present case. In *Alexander*, the prosecutor made the following statement: "I don't know of that many eight or nine year olds that are that sophisticated to fabricate a story involving sexual abuse." (Internal quotation marks omitted.) Id., 301. This court determined that the prosecutor, by making a general claim that no child would make up a story regarding sexual abuse, improperly was vouching for the complainant. Id., 305. In *Alexander*, there was no evidentiary support for the prosecutor's argument that the allegation of abuse would have been difficult to fabricate; thus, the sole source for this assertion was the opinion of the prosecutor. By contrast, in the present case, the prosecutor's argument that it was unlikely that E was lying was based on the consistency between his behavior and the behavioral patterns described by Krieger. Thus, the state's argument, in the present case, was proper because it was based on reasonable inferences drawn from the evidence, and not the prosecutor's opinion.

Turning to the fifth statement, we conclude that it was not misconduct for the prosecutor to argue that "[t]he kid who was molested came in here and faced you all and said it." As we have discussed previously, the prosecutor may argue for the reasonable inferences that the jury may draw from the evidence adduced at trial, including the defendant's commission of the crime. See *State* v. *Jeudis*, 62 Conn. App. 787, 796, 772 A.2d 715 (prosecutor's statement in closing argument that defendant sexually assaulted victim was proper because state first established evidentiary foundation that could lead jury to this factual finding), cert. denied,

256 Conn. 923, 774 A.2d 140 (2001). In making these arguments to the jury, "[t]he state's attorney should not be put in the rhetorical straightjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." *State* v. *Santiago*, supra, 269 Conn. 751. On the other hand, if the prosecutor makes conclusions without reference to facts in evidence, we must conclude that she was asserting her own personal opinion of the case. See id., 748–49 and n.8. It is in this latter scenario that the prosecutor oversteps her bounds and risks usurping the jury's factfinding role. Id., 749 and n.10.

In the present case, we conclude that the prosecutor's assertion that E was molested was not presented as his own personal opinion, but was rooted in the facts in evidence. When the statement is read in context, the prosecutor's assertion was based on the evidence regarding the behavioral patterns of sexually abused children and E's own testimony of the sexual assaults. Although the prosecutor's argument did not link explicitly the urged conclusion that E was molested with the evidence, "[w]e are mindful . . . that closing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) *State* v. *Haase*, 243 Conn. 324, 335–36, 702 A.2d 1187 (1997), cert. denied, 523 U.S. 1111, 118 S. Ct. 1685, 140 L. Ed. 2d 822 (1998), quoting *Donnelly*

v. *DeChristoforo*, 416 U.S. 637, 646–47, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).

We turn next to the sixth and seventh statements in which the prosecutor's two references to E as the victim are at issue.[6] The state argues that the Appellate Court improperly determined that these statements were improper because they were isolated uses of the term victim and the jurors, based on their knowledge of the case and common sense, would recognize that the prosecutor meant " 'alleged victim.' " In response, the defendant claims that these were improper comments on E's credibility and the defendant's guilt because this was not a case where the existence of a crime was conceded and the only question being tried was whether the defendant was the perpetrator. Rather, the defendant contends that, because this case presented the question of whether a crime had occurred, the premature use of victim stigmatized the defendant as being guilty. We agree with the state.

We recently have stated that a trial court's repeated reference to the complainant as the victim is inappropriate in cases where the commission of the crime is at issue because the "jury could have drawn only one inference from its repeated use, namely, that the defendant had committed a crime against the complainant." *State* v. *Cortes*, 276 Conn. 241, 249 n.4, 885 A.2d 153 (2005). Nevertheless, the individual making the reference to the complainant as the victim in the present case distinguishes it from the reference we determined to be improper in *Cortes*. In *Cortes*, it was the *trial court* that referred to the complainant as the victim and we concluded that this was inappropriate because the repeated references necessarily gave the jury the

[6] The prosecutor twice referred to E as the victim. The first statement was as follows: "You've sat here. You've listened to a victim." The prosecutor also stated: "The facts in this case cry out for a conviction. You heard from the victim."

impression that the state's evidence was credible. Id. In the present case, by contrast, it was the *prosecutor* that referred to the complainant as the victim, and, accordingly, we conclude that, under these circumstances, the jury was likely to understand that the state's identification of the complainant as the victim reflected the state's contention that, based on the state's evidence, the complainant was the victim of the alleged crimes.[7] Cf. *State* v. *Smith*, 51 Conn. App. 589, 592, 724 A.2d 527 (1999) (jury could have determined that prosecutor's use of " 'victim' " meant " 'alleged victim' "). Thus, we cannot conclude that the prosecutor's two references to E as the victim were improper.[8]

The eighth statement at issue is the following comment by the prosecutor during his closing argument: "I start out with [the instruction on the jury's role in assessing the credibility of witnesses] because the defendant took the stand in this case as did [E's mother] and certainly, I think we could all agree that after you heard their testimony there was no opportunity for the

[7] We caution the state, however, against making excessive use of the term "victim" to describe a complainant when the commission of a crime is at issue because prevalent use of the term may cause the jury to draw an improper inference that the defendant committed a crime against the complainant. In the present case, the prosecutor made only two references to E as the victim during rebuttal, as compared with thirty-four references to E by name during the closing and rebuttal argument. Accordingly, we cannot conclude that the prosecutor's use of the term victim was excessive in the present case.

[8] In addition, the state argues that the Appellate Court incorrectly determined that the following comment was an expression of the prosecutor's personal opinion that the defendant was guilty: "There's only one explanation in this case that makes sense and as difficult as it is to understand that it happens, it's that the defendant did exactly what he's accused of." See footnote 4 of this opinion. When read in context, this statement is not the prosecutor's unsworn testimony of the defendant's guilt. Rather, it is the prosecutor's rhetorical comment that, on the basis of the consistency between E's actions and Krieger's testimony of the common behavioral patterns of sexually abused children, the evidence supports finding the defendant guilty.

defendant to commit these acts because he was never home alone with the kids. That's what the mother said and basically that's what he said and those two rebuttal witnesses this morning, I would argue to you, disprove that. So why? Why would someone come in here and *lie about what happened*? Because *they are trying to cover it up*." (Emphasis added.) Defense counsel objected to this statement, but the trial court overruled the objection.[9]

The state argues that the Appellate Court improperly determined that this statement was improper because it was based on the commonsense inference that a person who commits a crime has a motive to lie. The defendant contends, in response, that this statement was improper because it was based solely on the prosecutor's own opinion that the defendant and E's mother lied about what happened and conspired to cover it up. We conclude that this statement was proper because it was an argument from the evidence.

The statement at issue consists of two parts: (1) that the defendant and E's mother lied in their testimony; and (2) that the defendant and E's mother's were motivated to lie in order to cover up the commission of the crimes. In the first part of the statement, the prosecutor argued that their testimony that the defendant was not often left alone with E was rendered not credible by the state's two rebuttal witnesses, both of whom testified that E's mother was regularly out of the house during the relevant time period. Thus, the prosecutor's argument that the defendant and E's mother were untruthful on this point was a reasonable inference drawn from the evidence. See *State* v. *Colon*, 272 Conn. 106, 250–51, 864 A.2d 666 (2004) (not improper for pros-

---

[9] The Appellate Court incorrectly stated that the trial court sustained the defendant's objection to this statement. *State* v. *Warholic*, supra, 84 Conn. App. 776 and n.3.

ecutor to characterize defendant's testimony as lie if based on evidence that would support inference that defendant was lying), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Ancona*, supra, 270 Conn. 608 (prosecutor's comments that witnesses were not candid in testimony due to cover-up was proper because it was based on circumstantial evidence that supported cover-up claim). Additionally, the risk that the jury would view the prosecutor's remark as unsworn testimony was nullified by his use, in the preceding sentence, of the phrase "I would argue to you," which is similar to "I submit to you." See *State* v. *Stevenson*, supra, 269 Conn. 585 (noting that prosecutor's remarks were not form of unsworn testimony because she used phrase " 'I suggest to you,' " which is similar to " 'I submit to you' ").

In the second part of the statement, the prosecutor asserted that the motive for the defendant and E's mother to lie was to cover up the crime. As we previously have discussed herein, "[i]t is not improper for a prosecutor to remark on the motives that a witness may have to lie . . . ." (Internal quotation marks omitted.) Id. Accordingly, we have allowed prosecutors to argue that the defendant and his witnesses may have a motive to lie in order to keep either themselves, or their friend or loved one, free from punishment. See id., 584–85 and n.15. The prosecutor, in the present case, was making a similar argument that the defendant and E's mother, who was the defendant's wife at the time of the trial, were lying to keep the defendant free from punishment.

The ninth statement at issue is the prosecutor's comparison of the motives of the defendant and E in testifying in this case.[10] The state claims that the Appellate

[10] The following is the relevant part of the state's rebuttal argument:

"[The Prosecutor]: What was the interest of the defendant in testifying? Well, you'll hear about that. The defendant's got a lot to lose in this case.

"[Defense Counsel]: Objection, Judge. That's improper. It's clearly

Court's determination that this comparison was improper is incorrect because of our recent decision in *Stevenson*.[11] In response, the defendant argues that this statement was an improper expression of the prosecutor's opinion because, unlike the police officers in *Stevenson*, E's motive in testifying truthfully was unascertainable. We agree with the state.

In *Stevenson*, we determined that it was not improper for the prosecutor to suggest in her rebuttal argument that the police and the victims had no reason to lie, whereas the defendant and his friends and family did have a motive to lie. Id., 584–85. We reasoned that this comparison was proper because it was based on the ascertainable motives of the witnesses and not personal opinion. Id. Further, we noted that the prosecutor's "remarks underscored an inference that the jury could have drawn entirely on its own, based on the evidence presented." Id., 585.

In the present case, we conclude that the prosecutor's remarks were proper because, as in *Stevenson*, the motives of both the defendant and E in testifying were ascertainable based on inferences drawn from the evidence and the jury's common sense. The defendant

improper.

"The Court: Sustained. Ignore that comment.

"[The Prosecutor]: The Judge will give you an instruction on the defendant's interest when he testifies. I would ask you to consider that charge that the Judge gives you and compare the defendant's interest in testifying in this case as versus [sixteen] year old [E]. What do each of those people have to gain by coming in here and either being truthful or not being truthful? That is for you to evaluate." Shortly thereafter the prosecutor stated: "What better evidence could you hope for than the eyewitness testimony of a [sixteen] year old boy with nothing to gain by coming in here and telling the truth."

[11] The state conceded, in the Appellate Court, that this statement was improper. After oral argument in the Appellate Court, we issued our decision in *Stevenson*. Accordingly, the state no longer concedes this point. Even if the state maintained its concession, we would not be bound by it. See *State v. Ledbetter*, 240 Conn. 317, 324, 692 A.2d 713 (1997).

does not challenge that the jury could have ascertained the defendant's motive in testifying, namely, to avoid punishment.[12] Further, as we have discussed previously herein, the state presented evidence from which the jury could infer that E did not have a motive to lie about the sexual assault allegations because, by making them, he perceived himself as being subjected to shame. See footnote 3 of this opinion.

2

Appeal to the Jury's Emotions

Two of the remarks that the Appellate Court determined to be improper were conceded as improper by the state because they appealed to the emotions of the jurors. The state first conceded that the following remark regarding the lack of cooperation by E's mother with the investigation by the state's attorney's office into E's allegations was an improper appeal to the jury's emotions: "And we know from the testimony here that when [E's mother] was asked to come down to the state's attorney's office and talk about this case, she didn't come." Defense counsel objected claiming that the trial court already had ruled that this testimony was improper for impeachment purposes because E's mother was not under any legal duty to meet with the state's attorneys. The trial court sustained the objection and instructed the jury to disregard the remark. The state also conceded that the following statement regarding the existence of child molesters in the community was improper: "The evidence proves that [the defen-

---

[12] Further, the trial court sustained defense counsel's objection to the prosecutor's comment that the defendant has "got a lot to lose in this case," and the trial court instructed the jury to ignore the comment. Thus, any possible harm from this comment was immediately cured. See *State* v. *Ubaldi*, 190 Conn. 559, 563, 462 A.2d 1001 ("a prompt cautionary instruction to the jury regarding improper prosecutorial remarks obviates any possible harm to the defendant"), cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

dant] is the child molester that he's accused of being. *They're out there. They're among us.*" (Emphasis added.) The trial court sustained defense counsel's objection and instructed the jury to ignore the statement.

We conclude that the Appellate Court properly determined that these two statements were improper. To the extent that the state argues that these statements were of minimal harm to the defendant, we will consider that claim in the second prong of our analysis.

### 3

### Injection of Extraneous Material into the Trial

The state next argues that the Appellate Court incorrectly concluded that the prosecutor impermissibly injected extraneous matters into the case by referring to E as a " 'cute little kid' "[13] and by appealing to the male jurors to identify with E.[14] In particular, the state

---

[13] The prosecutor's comments, in context, were as follows: "As I said to you before, I cannot explain why people do this. I don't know. I wish it never happened. I think we all do. That's not part of the case. I—I don't have to explain to you what could possibly be going on in someone's mind to possess them to do this to such a—a little kid. . . . There's a picture in evidence. You'll see what [E] looked like at the time. He's a cute little kid. What would possess somebody to do that? I have no idea, but you know how these cases unfold."

The Appellate Court noted that the prosecutor referred to E as a " 'cute little kid' " twice. *State* v. *Warholic*, supra, 84 Conn. App. 779. Our review of the transcript reveals that the prosecutor made only one such reference.

[14] For the sake of clarity, the challenged portions of the prosecutor's remarks are italicized. In context, the prosecutor's remarks were as follows: "Think back, *especially the men*, think back when *you were a young man* what the worst thing someone could say about *you* at age [twelve] or [thirteen]. What do you think *your friends and family would have thought* if the facts in this case came out *about one of us*? *Would you want your friends, would you want your father to know that about you*?

"So if there is some motive to be untruthful, why not say something else? This is the—the atomic bomb of shame to a young man—a young boy—a [thirteen] year old. Come up with something else. You can think of a thousand things that he could have said other than to put himself on his knees in the shower. Plenty other things could have kept him out of that house other than having to come in here and say that to all of us and to say that—again,

argues that its description of E as a " 'cute little kid' " was fair comment on the evidence because a photograph of E from when the alleged sexual assaults occurred had been admitted into evidence. Further, the state argues that it asked the jurors to identify with E solely to assess E's credibility in light of their own common sense and life experience, and not to garner sympathy. In response, the defendant argues that referring to E as a " 'cute little kid' " was a gratuitous remark intended only to elicit sympathy for E. Additionally, the defendant contends that asking the male jurors to identify with E was improper because it was an appeal to them to convict the defendant out of their fear of being sexually assaulted by a male. We conclude that the Appellate Court correctly determined that the description of E as a " 'cute little kid' " was improper, but incorrectly determined that the statement asking the jurors to identify with E was improper.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 719. Similarly, "a prosecutor should not inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." *State* v. *Williams*, supra, 204 Conn. 547; see also *State* v. *Watlington*, 216 Conn. 188, 193, 579 A.2d 490 (1990).

Turning first to the prosecutor's reference to E as a " 'cute little kid,' " we conclude that this remark was

---

this is the last time I'll say it and I hope it sinks in, but to say that to *your* father. How hard would that be? You would have to have one whopper of a motive to make that up."

improper. The prosecutor's personal opinion as to the complainant's appearance at the time of alleged sexual assault was irrelevant because it had no bearing on witness credibility or any factual issue in the case. Further, the sole purpose of this remark could only have been to encourage the jury to sympathize with E and to decide the case on the basis of passion and emotion. We previously have stated that "[i]t is improper for the prosecutor to encourage the jury to identify with the victim . . . ." *State* v. *Williams*, supra, 204 Conn. 547. Such encouragement is prohibited because a "prosecutor may not invite the jury to depart from its duty to view the evidence objectively, and instead view the case through the eyes of the victim." 75A Am. Jur. 2d, Trials § 664 (1991). Contrary to the state's argument, the fact that the prosecutor's comment may have been based on the evidence does not cure an otherwise improper appeal to the jury's passions and emotions. See *State* v. *Santiago*, supra, 269 Conn. 755–56 (concluding that, despite fact that defendant's nickname, Danger, was in evidence, prosecutor's use of nickname eighteen times during closing argument was improper appeal to jury's passions, emotions and prejudices).

Nevertheless, we conclude that the prosecutor's latter remark asking the jurors to identify with E for the purpose of weighing his credibility was not improper. The prosecutor urged the jury, particularly the male jurors, to assess E's credibility by recognizing the emotional difficulty that E subjected himself to by making the allegations of sexual assault. Although we previously have noted our disapproval of arguments to the jury that single out jurors by gender; *State* v. *Williams*, 231 Conn. 235, 247, 645 A.2d 999 (1994), overruled on other grounds, *State* v. *Murray*, 254 Conn. 472, 499, 757 A.2d 578 (2000); we conclude that the prosecutor's appeal to "especially the men" on the jury was not a plea to decide the case on the basis of their own bias

or sympathy for E. Rather, this argument was proper because it asked the jurors to assess E's credibility on the basis of their common sense and life experience. See *Williams* v. *State*, 689 So. 2d 393, 399 (Fla. App.) (remark to jury to identify with trauma that victim's son must have experienced in witnessing crime was proper argument to explain inconsistencies in son's testimony), appeal denied, 697 So. 2d 513 (Fla. 1997); *State* v. *May*, 710 N.W.2d 545 (Iowa App. 2005), 2005 Iowa App. LEXIS 1530, *17–18 (December 21, 2005) (argument to jury to consider nine year old complainant's view of world and courage it took to accuse her stepfather of sexual assault was proper because it sought to help jurors understand complainant's actions and gaps or inconsistencies in her testimony); *State* v. *McHenry*, 276 Kan. 513, 522–23, 78 P.3d 403 (2003) (argument to jury to consider how victim's brothers felt when victim was being sexually assaulted was proper argument because it was not appeal to sympathy or prejudices but sought to explain from evidence why brothers finally reported abuse to mother); *State* v. *Rose*, 353 N.W.2d 565, 568 (Minn. App. 1984) (proper to appeal to jury to assess credibility of thirteen year old complainant by identifying with difficulty she must have experienced in testifying about sexual assault allegations).

B

Alleged Misconduct During Cross-Examination

The state next claims that the Appellate Court improperly concluded that, during cross-examination, the prosecutor compelled the defendant to comment on the veracity of E's testimony. In addition, the state argues that the Appellate Court also improperly determined that the prosecutor attacked the character of the defendant and his witness, E's mother, during cross-

examination. We will address each of these claims in turn.

1

Asking the Defendant to Comment on the Veracity of E

The state first contends that the Appellate Court improperly determined that the prosecutor violated our decision in *State* v. *Singh*, supra, 259 Conn. 693, on at least three occasions during his cross-examination of the defendant.[15] Specifically, the state argues that the prosecutor's cross-examination properly sought to elicit facts regarding E's possible motive to lie as permitted by our decision in *State* v. *Ceballos*, supra, 266 Conn. 364. In response, the defendant argues that not only did the Appellate Court properly determine that three of the prosecutor's questions violated *Singh*, but four additional questions violated *Singh* as well.[16] We con-

---

[15] The Appellate Court's opinion states that there were at least four *Singh* violations, but it identified only three questions that possibly could be interpreted as requiring the defendant to comment on E's veracity. See *State* v. *Warholic*, supra, 84 Conn. App. 781 and n.8. In addition, the defendant concedes, in its brief in this court, that the Appellate Court determined that only three questions violated *Singh*.

[16] The seven questions that are at issue are italicized in the following exchanges between the prosecutor and the defendant from the state's cross-examination. Because the fifth question is restated at the defendant's request, it is counted only once.

"Q. Describe your relationship with [E].

"A. Stepfather.

"Q. No problems between the two of you?

"A. The basic not cleaning up his room.

"Q. Ordinary kid stuff?

"A. Yeah.

"Q. *Were you ever so mean to him that you think he would make up a story like this*?

"A. Not that I can think of. No.

"Q. And you told this jury that you never bathed him or showered with him, right?

"A. No, I did not.

"Q. So *does it make any sense to you that he may have misinterpreted something you did as sexual assault*?"

Defense counsel then objected, claiming that the defendant "doesn't have to pass on [E's] credibility, that's not his function." The court sustained

clude that all but one of these seven challenged questions were proper.

"Prosecutorial misconduct may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh,* supra, 259 Conn. 700. Accordingly, we have concluded that it is improper to ask a witness to comment on the veracity of another witness' testimony. Id., 706–707. Specifically, we have stated that it is improper to

defense counsel's objection. At a later point in the prosecutor's cross-examination of the defendant, the following colloquy occurred:

"[The Prosecutor]: *Do you know of any reason why [E] would make this up of your own firsthand knowledge?*

"[Defense Counsel]: Objection, Judge. . . . You said that he doesn't have to pass on [E's] credibility. I want to make a motion, too.

"The Court: No. He can ask that question.

"[The Defendant]: Could you repeat the question?

"[The Prosecutor]: Sure. *Was there anything about the relationship with [E] that explains why he made this up that you observed or that you know of your own firsthand knowledge?*

"[The Defendant]: No.

"[The Prosecutor]: Is it your—*Was it your position that [E] made this up because you demanded more of him than his father?*

"[Defense Counsel]: Objection. . . .

"The Court: Overruled . . . .

"[The Defendant]: Could you repeat that?

"[The Prosecutor]: *Was it your position that [E] made it up because you demanded more of him than his father?*

"[The Defendant]: Are you asking me if I said [E] made it up because—

"[The Prosecutor]: Okay. *Did you ever say [E] made it up?*

"[The Defendant]: No."

At a later point in the cross-examination, the following exchange between the prosecutor and the defendant occurred:

"Q. *Did you say to the department of children and families that [E] had made this up because you demanded more of him than his father?*

"A. No, I did not say that."

ask the defendant if another witness' testimony was incorrect, made up, wrong, or consisted of lies. Id., 702–704; see also *State* v. *Ceballos*, supra, 266 Conn. 377 and n.26. We have identified two reasons for this prohibition. "First, it is well established that determinations of credibility are for the jury, and not for witnesses." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 707. "Second, questions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied." Id., 708.

Nevertheless, we have distinguished between improperly asking the defendant to comment on the veracity of another witness' testimony and properly questioning the defendant about his accuser's motive in testifying against him. *State* v. *Ceballos*, supra, 266 Conn. 381. Questions about a witness' motive are proper because they seek to elicit facts from which a jury can make credibility determinations. Accordingly, in *Ceballos*, we concluded that the following questions were proper: "So, [the complainant] must have been very angry at you for something to come in here and say that she had been kissed by you? . . . So, you must've done something mean to the [complainant] to make her come in here and testify that you did that to her? . . . So, [the complainant], in order to come in here and say that, must have something against you personally?" (Internal quotation marks omitted.) Id., 377–78 n.26.

Turning to the present case, the two questions[17] that asked the defendant if he had any knowledge as to

---

[17] We refer to two of the prosecutor's questions to the defendant. The first question was as follows: "Do you know of any reason why [E] would make this up of your own firsthand knowledge?" The prosecutor also asked the defendant: "Was there anything about the relationship with [E] that explains why he made this up that you observed or that you know of your own firsthand knowledge?"

why E would make up these allegations were proper attempts under *Ceballos* to determine whether E had a motive to lie. In addition, the prosecutor's question that asked the defendant if he was ever so mean to E that E would have fabricated the allegations was also a proper attempt to elicit facts about E's possible motive to lie. Further, the prosecutor's question that asked if it made sense to the defendant that he might have done something that could have been misinterpreted by E as a sexual assault was not an improper request to comment on E's veracity. Rather, this question, like the questions seeking facts to show a motive to lie, sought to elicit facts that would show that E's allegations did not arise from a misunderstanding.

While "a witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong"; *State* v. *Singh*, supra, 259 Conn. 712; the fifth, sixth and seventh questions at issue[18] require us to determine whether it was improper to ask the defendant if he previously stated or took the position that the complainant was lying about the allegations. We conclude that asking the defendant about prior statements that questioned a witness' veracity in previously making the same allegations that the witness testified to during the trial may implicate some of the same concerns that underlie the rule prohibiting direct questions about the veracity of a witness' testimony. First, the defendant's testimony

---

[18] The fifth and sixth questions that are at issue were the result of the following exchange between the prosecutor and the defendant:

"Q. Was it your position that [E] made it up because you demanded more of him than his father?

"A. Are you asking me if I said [E] made it up because—

"Q. Okay. Did you ever say [E] made it up?

"A. No."

The seventh question occurred later in the cross-examination of the defendant when the prosecutor asked, "[d]id you say to the department of children and families that [E] had made this up because you demanded more of him than his father?"

as to whether he previously said E was lying is irrelevant because it does not aid the jury in making credibility determinations. See *People* v. *Melton,* 44 Cal. 3d 713, 742–44, 750 P.2d 741, 244 Cal. Rptr. 867 (1988) (cross-examination of defendant's witness solely to elicit facts that would lead jury to conclude that he did not *previously* believe another witness' statements was irrelevant); see also *State* v. *Singh,* supra, 707–708 (observing that questions about another witness' veracity are improper because they do not aid jury in assessing witness credibility or in determining defendant's guilt or innocence). Second, the jury may interpret the defendant's response to such a question as an indirect comment on the truthfulness of the complainant's trial testimony. Although we acknowledge that asking about a prior belief that the complainant was lying will likely have less of an impact on the jury than asking if the defendant presently believes that the complainant lied during his testimony, such a question still poses a risk of invading the province of the jury as the sole arbiters of witness credibility. See *State* v. *Singh,* supra, 707. Finally, asking the defendant if he previously stated that the complainant had made up these same allegations creates a risk that "the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied." Id., 708.

In the present case, the fifth and seventh questions asked, in essence, if the defendant stated that E made up the allegations because he demanded more of E than his father. Although those questions were phrased artlessly, the focus of these questions was on E's possible motive to fabricate. Thus, we conclude that the fifth and seventh questions, while on the border of impropriety, were, in the context of the present case, not improper. In contrast, the sixth question was improper because it directly asked the defendant whether he said that E had made up the allegations. To the extent that

the defendant's response to the sixth question may be interpreted as a denial of making this statement and not as a comment on E's veracity, this may reduce the question's prejudice and, accordingly, will be considered in the due process prong of our analysis.

Having determined that six of the seven challenged questions were proper under *Ceballos*, we turn to the defendant's request that we overrule our decision in that case and prohibit asking defendants about a witness' motive to lie. The defendant argues that we should adopt a bright line rule prohibiting these questions because it would free trial courts from having to make the fine distinction between prohibited questions about another witness' veracity and permissible questions about another witness' motive to lie.

In response, the state argues that the doctrine of stare decisis requires a highly persuasive reason for this court to overrule its earlier decision and that the defendant's argument to overrule *Ceballos* does not meet this high threshold. Specifically, the state contends that the prosecutor should be able to ask a defendant about the complainant's motive to lie because these questions elicit facts, and, thus, do not run afoul of the reasons set forth in *Singh* for prohibiting questions about another witness' veracity. Additionally, the state argues that, because the case law from other jurisdictions is mixed on this question, this court is not compelled by the most cogent reasons or inescapable logic to abandon its precedent. We agree with the state.

The doctrine of stare decisis "counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency.

. . . Stare decisis, however, is not an end in itself. . . . Experience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better. . . . Indeed, [i]f law is to have current relevance, courts must have and exert the capacity to change a rule of law when reason so requires." (Citations omitted; internal quotation marks omitted.) *State v. Skakel*, 276 Conn. 633, 690–91, 888 A.2d 985 (2006).

The few jurisdictions that have considered the propriety of asking the defendant about his knowledge of another witness' motive to lie have reached conflicting conclusions. In *State v. Maluia*, 107 Haw. 20, 24, 108 P.3d 974 (2005), the court concluded, in a 3 to 2 decision, that it was improper for the prosecutor to ask the defendant if he knew why the state's witnesses would fabricate their testimony because "the practical effect [of this question] was that [the defendant] was asked to comment on the veracity of the prosecution's witnesses."[19] Similarly, in *Allen v. United States*, 837 A.2d 917, 920–21 (D.C. 2003), the court concluded that asking about a witness' motive to lie was improper because the question is based on the "false supposition that the witness must have perjured himself to be disbelieved" and that prohibiting such questions will give prosecutors and trial courts clearer guidance.[20]

On the other hand, the First Circuit Court of Appeals concluded in *United States v. Akitoye*, 923 F.2d 221,

[19] The minority in *Maluia*, in a separate opinion, chided the majority for failing to distinguish between questions that ask if the witness was lying and questions that ask what motive the witness might have to lie. *State v. Maluia*, supra, 107 Haw. 30 (Nakayama, J., concurring in part and dissenting in part). "Those of the latter type are distinguishable because they strive to illuminate facts—as opposed to mere opinion—from which the jury may independently adduce whether a [witness'] testimony is free of fabrication." Id.

[20] The defendant, in support of his argument, also cites the Iowa Supreme Court's decision in *State v. Graves*, 668 N.W.2d 860 (Iowa 2003). The defendant's reliance on *Graves* is misplaced because the prosecutor's questions in that case solely asked whether the witnesses were lying. Id., 870–74.

224 (1st Cir. 1991), that it was proper for a prosecutor to inquire as to the defendant's knowledge "of any known basis for bias on the part of a key witness." The court reasoned that because "a cross-examiner may bring out facts and circumstances tending to show bias, thereby weakening the credibility of a hurtful witness, we believe it follows that the cross-examiner can be allowed some latitude, in an appropriate case, to bring out the absence of bias-producing facts and circumstances, thereby strengthening the credibility of a helpful witness." Id., 225. The court distinguished these types of questions from questions about another witness' veracity, remarking that the former are proper because they do "not call for an opinion, but for articulable facts." Id.; see also *United States* v. *Cole*, 41 F.3d 303, 309 (7th Cir. 1994) (questions about defendant's knowledge of biases and motives of government's witnesses were proper in light of defendant's direct testimony characterizing these witnesses as liars), cert. denied, 516 U.S. 826, 116 S. Ct. 94, 133 L. Ed. 2d 49 (1995); *State* v. *Graham*, 59 Wash. App. 418, 427, 798 P.2d 314 (1990) (prosecutor's questioning of defendant about complainant's motive to lie was proper because defendant made issue of complainant's credibility).

We conclude that we are not presented with compelling reasons to abandon our decision in *Ceballos*. Rather, we agree with *Akitoye* and the dissent in *Maluia* that these questions are proper because they seek to elicit facts concerning motive or bias from which the jury independently can determine witness credibility. Cf. *State* v. *Singh*, supra, 259 Conn. 708 (rejecting veracity questions because they "have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility" [internal quotation marks omitted]). Accordingly, these questions, if properly posed, do not invade the province of the jury because they do not seek to elicit

a witness' opinion of the veracity of another witness' testimony.[21]

## 2

## Attack on the Character of the Defendant and E's Mother

The state next argues that the Appellate Court incorrectly concluded that it had improperly attacked the character of E's mother by posing questions to her that suggested she had attended Narcotics Anonymous meetings, despite the trial court's prior ruling barring the state from inquiring into her attendance at such meetings. The following additional facts are necessary to resolve this claim. During the direct examination of E, the state, with the jury excused, sought permission

[21] We also disagree with the defendant that the failure to create a bright line rule would be inconsistent with our prior rejection of creating an exception to the bar on questions about another witness' veracity. In *State* v. *Singh*, supra, 259 Conn. 710, the state urged us to recognize an exception when the defendant's testimony conflicts with that of another witness in a manner that cannot "be attributed to defects or mistakes in a prior witness' perception or inaccuracy of memory . . . ." (Internal quotation marks omitted.) We rejected this exception because the state in that case failed to provide a reason why this exception was necessary and we determined that it was inappropriate for the trial court to make the difficult distinction between when testimony conflicts because of the lack of veracity and when testimony conflicts for other reasons. Id., 711. Additionally, we concluded that this predicate determination is properly relegated to the jury. Id. In the present case, there is a reason to allow questions about a motive to lie: "[T]he absence of bias-producing facts and circumstances . . . [strengthens] the credibility of a helpful witness." *United States* v. *Akitoye*, supra, 923 F.2d 225. In addition, allowing motive to lie questions does not require the trial judge to make a predicate determination that is relegated to the jury. Finally, if the question is poorly phrased or asked in a manner that requires the defendant to comment, even indirectly, on the veracity of a witness' testimony, the trial court has wide latitude to limit such cross-examination. See *State* v. *Lee*, 229 Conn. 60, 70, 640 A.2d 553 (1994) ("trial judges retain wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant" [internal quotation marks omitted]).

from the trial court to elicit testimony from E that the opportunity arose for the defendant to sexually assault him because his mother was regularly attending Narcotics Anonymous meetings. The state informed the trial court that E would testify that when he saw his mother pick up her blue notebook that she would bring to Narcotics Anonymous meetings, he would go to his room because he knew the sexual assaults would then occur. The trial court ruled that, while E could testify that he was familiar with his mother's routine and when she would be out of the house, he could not mention that she was attending Narcotics Anonymous meetings because "it is totally irrelevant and highly prejudicial by association." Subsequently, during E's direct examination, he testified that, at the time of the alleged sexual assaults, his mother, as part of her regular routine, would leave the house with a blue notebook.

During the state's cross-examination of E's mother, the prosecutor asked her if she had had a drinking problem during the time period when the alleged sexual assaults were occurring. Upon defense counsel's objection, the judge excused the jury and asked the prosecutor what he was trying to prove with this line of questioning. The prosecutor responded that he wanted to ask E's mother if, at the time of the alleged sexual assaults, she regularly left her home to attend Narcotics Anonymous meetings and if her perception was affected by being intoxicated during this time period. The trial court ruled that the prosecutor could only ask about active drinking at the relevant time period and not about any treatment that she may have been receiving. After the jury reentered the courtroom, the following exchange occurred between the prosecutor and E's mother:

"Q. Back in 1993 . . . were you either drinking or using drugs that affected your ability to pay attention to what was going on in your house?

"A. No, I was not.

"Q. Did you ever have a blue notebook in your house that you brought to meetings?

"A. Brought to meetings?

"Q. Yeah, a blue spiral notebook that you brought to meetings?

"A. No.

"Q. No?

"A. No." Defense counsel did not object to any of the prosecutor's questions.

The state first argues that defense counsel's failure to object to these questions reveals that, in the context of the trial, the term "meetings" did not have the meaning that the defendant now ascribes to it. In addition, the state claims that, although the jurors may have inferred that the meetings concerned substance abuse, the jurors could also have inferred that the meetings referred to "school, church, or some other type of meetings." Finally, the state claims that we should assume the jury followed the trial court's instruction and made its decision on the basis of the evidence and not the state's questions. The defendant argues, in response, that the state purposefully juxtaposed its question about drinking and drug use by E's mother with questions that discussed her attendance at meetings. Accordingly, the defendant contends that any reasonable juror would have construed the word "meetings" as relating to drug and alcohol treatment. We agree with the state.

A prosecutor may not appeal to the emotions of the jurors by engaging in character assassination and personal attacks against either the defendant or one of his witnesses. See *State* v. *Williams*, supra, 204 Conn. 546–47. A prosecutor may not ask a question or make a comment during cross-examination that suggests that

the defendant has a bad character or propensity for criminal behavior. *State* v. *Ubaldi*, 190 Conn. 559, 563, 462 A.2d 1001 (prosecutor's question improperly suggested that defendant gambled illegally with allegedly stolen municipal funds), cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); *People* v. *Balkum*, 149 App. Div. 2d 976, 540 N.Y.S.2d 113 (1989) (prosecutor impermissibly implied, during defendant's cross-examination and in closing argument, that defendant's drug addiction and poverty indicated propensity to commit crime charged); see also *State* v. *Williams*, supra, 546–47 (prosecutor impermissibly referred to defendant in closing argument and cross-examination as "drunken bum," "drunk who uses cocaine and smokes marijuana and beats children," "coward," "hiding like a dog," "stupid," and "evil man" [internal quotation marks omitted]). Accordingly, when cross-examining a witness about drug or alcohol use, it is proper to ask if the witness was intoxicated during the time periods relevant to her testimony because it impacts her testamentary capacity, but the witness may not be impeached on the basis that she generally suffers from or has sought treatment for a substance abuse problem. See *State* v. *Ireland*, 218 Conn. 447, 457, 590 A.2d 106 (1991) ("concerns as to the intoxication of the witness . . . go to the weight of the evidence"); *State* v. *Smith*, 42 Conn. App. 41, 55–59, 680 A.2d 1340 (1996) (trial court properly allowed defendant to cross-examine witness regarding possible affect of alcohol on memory during time periods relevant to witness' testimony, but precluded cross-examination concerning witness' treatment for alcoholism).

In the present case, we conclude that the prosecutor's questions to E's mother concerning whether she took a blue notebook to "meetings" were proper. First, "we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's

argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 483; see also *State* v. *Reynolds*, 264 Conn. 1, 207, 836 A.2d 224 (2003) ("[i]nasmuch as defense counsel had heard the comments of the state's attorney when they were made, defense counsel was in a position to assess what impact, if any, the comments may have had on the jury and to determine what remedy to seek"), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). Accordingly, the failure of defense counsel to object to the prosecutor's questions indicates that the term "meetings" did not unfairly intimate to the jury that E's mother was going to meetings related to treatment for drug or alcohol abuse. This conclusion is further bolstered by the trial court's silence in light of its ruling, immediately prior to the questioning, prohibiting the prosecutor from asking about the mother's treatment for substance abuse and the fact that the trial court has an ongoing "duty to deter and correct misconduct of attorneys . . . ." (Internal quotation marks omitted.) *In re Jonathan M.*, 255 Conn. 208, 234, 764 A.2d 739 (2001). Additionally, we agree with the state that numerous reasonable interpretations could have been given to its use of the term "meetings" and it was not necessary that the jury construe "meetings" as regarding the treatment of alcohol or drug abuse. Most notably, in light of E's earlier testimony that his mother regularly left the house with a blue notebook, the jury could have interpreted this question as an attempt to corroborate E's testimony on this point.

The state next claims that the Appellate Court improperly determined that the prosecutor attacked the defendant's character during cross-examination by intimating that the defendant had a substance abuse

problem. This claim arises from the following exchange during the state's cross-examination of the defendant:

"[The Prosecutor]: *Did you have an alcohol or drug problem around 1993, 1994?*

"[The Defendant]: No, I did not.

"[The Prosecutor]: Do you recall being interviewed by the department of children and families on [March 17, 1999] by this Virginia Yardey?

"[The Defendant]: Yes.

"[The Prosecutor]: *Do you recall telling her you had been*—

"[Defense Counsel]: I would object, Judge.

"[The Prosecutor]:—*straight*[22]—" (Emphasis added.)

The trial court sustained defense counsel's objection and the prosecutor then asked: *"Do you recall what you told the department of children and families about your substance abuse during the time period . . . ?"* (Emphasis added.) The trial court then excused the jury and addressed the prosecutor, stating: "Whenever you're dealing with issues one step removed from the actual allegations, and they're highly prejudicial, you're always on thin ice, so, you know, so when you're dealing with these issues, you're always a half step away from a mistrial. Do you want to try this case over again and put that little boy through this all over again?" The prosecutor responded that he did not want to do that and explained that he was trying to attack the defendant's ability to perceive and recall facts from the relevant time period based on a statement he gave to the department of children and families in 1999, in which

___

[22] The Random House Dictionary of the English Language (2d Ed. 1987) defines "straight" to include "free from using narcotics." In addition, the Oxford Dictionary of Modern Slang (1992) defines "straight" as "[n]ot using or under the influence of drugs."

he said that he had been "straight" for approximately four years. The trial court ruled that the defendant's statement that he had been "straight" since 1995, had no bearing on his sobriety in 1993 and 1994, which is when the alleged sexual assaults occurred. The trial court then cautioned the prosecutor that "there's a difference between character assassination and cross-examination . . . ." The prosecutor subsequently abandoned this line of questioning. Shortly thereafter, upon the prosecutor's questioning of the defendant regarding any possible motive E might have had to fabricate the allegations, defense counsel made a motion for a mistrial because "the prosecutor now has been suggesting that there's evidence about certain things, just through his questions, that there is not." The trial court denied the motion.

The state argues that this was permissible cross-examination regarding the defendant's ability to perceive and recollect events from the time period relevant to his testimony and that its questions did not indicate that the defendant had undergone any treatment for substance abuse. Further, the state claims that any prejudice was mitigated by the following facts: the defendant denied having a substance abuse problem in 1993 and 1994, and he did not answer the subsequent questions; the questions themselves were not evidence; and the trial court instructed the jury to decide the case on the evidence. Finally, the state argues that the trial court was in the best position to judge the prejudice of these questions and it denied the defendant's subsequent motion for a mistrial. In response, the defendant argues that the Appellate Court correctly concluded that these questions[23] constituted an improper attack on his char-

[23] The Appellate Court identified only the following question as impermissibly attacking the defendant's character: "Do you recall what you told the department of children and families about your substance abuse during the time period . . . ." (Internal quotation marks omitted.) *State* v. *Warholic,* supra, 84 Conn. App. 782. Nonetheless, both parties have addressed, in their

acter because they suggested that the defendant had a substance abuse problem at some point in the past. We agree with the state.

At the outset, we note that the prosecutor's questions do not suggest that the defendant had a propensity to commit the alleged crimes due to substance abuse. Thus, the issue is whether the prosecutor's questions impermissibly suggested that the defendant has a bad character because he suffers from a substance abuse problem or if the questions were permissible cross-examination regarding the possible impairment of the defendant's testamentary capacities. The prosecutor's first question, which asked if the defendant suffered from a substance abuse problem in 1993 and 1994, was properly limited in scope to the time period when the use of drugs and alcohol could have impacted his memory and perception. Thus, this question did not attempt to impeach the defendant on the basis that he generally suffered from a substance abuse problem. Similarly, the prosecutor's third question, which asked what the defendant previously said about his substance abuse during a certain time period, also seemingly would have been limited to the relevant time period if it had not been interrupted by defense counsel's objection.

Somewhat more troubling is the prosecutor's second question, which asked if the defendant recalled saying that he had been "straight." Again, due to defense counsel's objection we cannot be certain that the question would have been narrowly tailored to the relevant time period. Nonetheless, even if we were to assume, arguendo, that the second question could be interpreted as improper impeachment on the basis that the defendant generally suffered from a substance abuse problem, any harm would be minimal because the trial court

---

briefs to this court, the propriety and potential prejudice of all three of the prosecutor's questions regarding substance abuse.

sustained defense counsel's objection and did not allow the defendant to answer the question. See *State* v. *Coney*, 266 Conn. 787, 820, 835 A.2d 977 (2003) (harm from improper question on cross-examination was immediately cured when trial court sustained defense counsel's objection); *State* v. *Ubaldi*, supra, 190 Conn. 563 (minimal prejudice from question's improper suggestion where defendant did not respond, court excused jury to discuss objection to question, and court instructed jury to disregard question). Further, any possible harm was also minimal because the prosecutor abandoned this line of inquiry after being warned by the trial court and did not make reference to substance abuse during closing argument. Cf. *State* v. *Ubaldi*, supra, 564–75 (reversing conviction where prosecutor, in defiance of trial court ruling, referred during closing argument to improper suggestion contained in cross-examination question). Finally, any possible harm was mitigated by the trial court's instruction, at the beginning and end of the trial, that the attorneys' statements are not evidence. See *State* v. *Couture*, 194 Conn. 530, 563, 482 A.2d 300 (1984) ("[i]f the characterization of the defendant consisted of an isolated remark we would conclude that the potential prejudicial impact on the jury could be obviated by a curative instruction"), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).

II

## DUE PROCESS RIGHT TO FAIR TRIAL

In part I of this opinion, we concluded that the prosecutor committed the following misconduct: (1) attempted to elicit the jury's sympathy for E by gratuitously remarking that at the time of the alleged sexual assaults E was a "cute little kid"; (2) appealed to the jury's emotions by stating that E's mother refused to come to the state's attorney's office and by stating that

child molesters are "out there" and "among us"; and (3) committed one *Singh* violation during the cross-examination of the defendant. "[W]e now turn to the ultimate question, which is whether the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 407–408. "To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . This inquiry is guided by an examination of the following *Williams* factors: the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Spencer*, 275 Conn. 171, 180, 881 A.2d 209 (2005), quoting *State* v. *Williams*, supra, 204 Conn. 540.

The state has not argued that the misconduct was invited by defense counsel's conduct or argument; *State* v. *Warholic*, supra, 84 Conn. App. 783; and concedes that its case was "not particularly strong" because the credibility of the defendant and E was the central issue in the case. The state does contend, however, that the Appellate Court overstated the frequency and severity of any prosecutorial improprieties. In addition, the state argues that the Appellate Court failed to give weight to

the fact that most of the acts of misconduct were not preserved, the trial court's curative instructions and the jury's request to rehear all of E's testimony. In response, the defendant argues that the Appellate Court correctly concluded that the defendant was deprived of a fair trial because the state's case was weak and the misconduct was central to the issue of witness credibility, the prosecutor's misconduct was frequent and severe as demonstrated by the trial court's threat to declare a mistrial, and the trial court's instructions were insufficient to cure the substantial misconduct. We agree with the state.

A

Strength of the State's Case and the Centrality
of the Misconduct

The state concedes that, because witness credibility was the central issue, its case was "not particularly strong." The defendant argues that the state's case was weak because there was no physical evidence that the defendant sexually assaulted E. We have stated that a "child sexual abuse case lacking conclusive physical evidence, when the prosecution's case rests on the credibility of the victim . . . is not particularly strong . . . ." (Internal quotation marks omitted.) *State* v. *Ceballos,* supra, 266 Conn. 416; see also *State* v. *Beaulieu,* 274 Conn. 471, 482, 876 A.2d 1155 (2005) (concluding that state's case was not strong where only evidence other than victim's testimony was photographs of bruising on victim). In the present case, we agree that the state's case was not strong because it lacked corroborating physical evidence. With regard to the centrality of the misconduct, we note that only one of the acts of misconduct, the lone *Singh* violation, impacted the crucial issue in the case: E's credibility.

## B

### Frequency and Severity of the Misconduct

We next turn to the frequency and severity of the prosecutor's misconduct. The state argues that the misconduct was not frequent because it occurred only a few times during cross-examination and closing argument, and was not repeated throughout the trial. Further, the state claims that the *Singh* violation was not severe because the prosecutor did not ask the defendant explicitly if E was lying and the prosecutor did not argue to the jury that it could acquit the defendant only if it found that the other witnesses were lying. In response, the defendant claims that the Appellate Court correctly concluded that the misconduct was severe and pervasive as demonstrated by the fact that the prosecutor's acts nearly caused a mistrial.

We first conclude that the instances of prosecutorial misconduct were not isolated because they occurred during both the cross-examination of the defendant and the prosecutor's closing and rebuttal arguments. See *State* v. *Ceballos*, supra, 266 Conn. 411 ("prosecutorial improprieties . . . were not just isolated instances [because] they occurred during both the questioning of witnesses and during argument"). We next conclude that the prosecutor's appeals to the jury's emotions by commenting that E's mother failed to cooperate with the state's attorney's office and that child molesters existed in the community constituted severe misconduct, but that his reference to E as a "cute little boy" was not severe. In evaluating the severity of the misconduct, "we take into consideration whether defense counsel object[ed] to any of the improper remarks, request[ed] curative instructions, or move[d] for a mistrial." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 269 Conn. 758. The severity of the prosecutor's statements regarding the lack of cooperation by E's mother

and the existence of child molesters in the community is revealed by the fact that defense counsel objected both times, the trial court sustained the objections and gave curative instructions, and the defendant later moved for a judgment of acquittal based, in part, on the prosecutor's alleged misconduct in appealing to the jury's emotions. In contrast, we conclude that the prosecutor's remark that E was a "cute little boy" was not severe because it was fleeting and defense counsel failed to object to it.

Turning to the *Singh* violation, we conclude that, despite defense counsel's objection to this line of questioning, this misconduct was not severe. One of the reasons we prohibit questioning the defendant on the veracity of other witnesses' testimony is because "questions of this sort . . . create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied." *State* v. *Singh*, supra, 259 Conn. 708. Accordingly, we have concluded that the harm from a *Singh* violation "may be ameliorated by the defense's own claim, be it implicit or explicit, that the opposing witnesses lied." *State* v. *Stevenson*, supra, 269 Conn. 594.

In the present case, the main thrust of the defendant's closing argument was that E's story was not credible due, in part, to his failure to tell anyone about these allegations before his stepmother threatened to separate him from his sisters and send him to live with his mother. In support of this argument, the defendant highlighted the testimony of E's mother that she told E that he was lying about the allegations and the defendant argued that her testimony should be persuasive to the jury given a mother's intimate knowledge of her children. Implicit in this argument was the claim that E fabricated the allegations to keep his stepmother from

separating him from his sisters.[24] Thus, this argument ameliorates some of the *Singh* violation's harm by reducing the risk that the jury would unfairly conclude that it could acquit the defendant only if it determines that E had lied. Additionally, the harm of the *Singh* violation was further lessened by the fact that the prosecutor did not reference it during final arguments. Cf. *State* v. *Singh*, supra, 259 Conn. 724–25 (distinguishing case where misconduct occurred during cross-examination and was repeated in closing argument from case where improper cross-examination was not further highlighted by prosecutor). Finally, the *Singh* violation was less harmful than if the prosecutor had explicitly asked if the defendant thought E was lying. On the basis of the prosecutor's phrasing of this question as whether the defendant ever said that E fabricated the allegations, the jury could have interpreted the defendant's negative response as a denial that he ever made the statement and not as the expression of an opinion concerning E's credibility.

## C

### Curative Measures

The final factor to consider is the strength of the curative measures. The state claims that the Appellate Court incorrectly concluded that the trial court's curative measures were insufficient to mitigate the harm of the prosecutor's misconduct. Specifically, the state argues that the trial court's curative measures were sufficient because: (1) absent any indication to the contrary, the jurors are presumed to follow the trial court's instructions; (2) the *Singh* violation was cured by the trial court's instruction during the preliminary and general instructions that the jurors were the sole deter-

---

[24] In only one brief instance did defense counsel raise the prospect, as testified to by Krieger, that a person honestly may believe that he was sexually assaulted when he, in fact, was not.

miners of witness credibility; (3) the prosecutor's appeals to the jurors' emotions during closing argument were cured by the trial court's immediate instruction to disregard the remarks; and (4) the jurors' request to rehear E's testimony is evidence that the trial court's instructions cured any prosecutorial misconduct. In response, the defendant argues that the Appellate Court properly determined that the trial court's curative and general instructions were insufficient because the prosecutor's misconduct was substantial. We agree with the state.

"[W]e have previously recognized that a prompt cautionary instruction to the jury regarding improper prosecutorial remarks or questions can obviate any possible harm to the defendant. . . . Moreover, [i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions. . . . We note, however, that a general instruction does not have the same curative effect as a charge directed at a specific impropriety, particularly when the misconduct has been more than an isolated occurrence." (Citations omitted; internal quotation marks omitted.) *State v. Ceballos*, supra, 266 Conn. 413.

In the present case, the trial court sustained defense counsel's objections to the prosecutor's comments regarding the lack of cooperation by E's mother and the existence of child molesters in the community and immediately instructed the jury to disregard these remarks. Further, the trial court, after closing arguments, instructed the jurors that they were to find facts solely on the basis of the evidence introduced in court and that they were not to "be influenced by any personal likes or dislikes, opinions, prejudices or sympathy." We therefore conclude that the trial court's prompt curative actions and subsequent general instructions mitigated any harm created by these two instances of misconduct.

Turning next to the prosecutor's remark that E was a "cute little boy," we note that the trial court did not give any specific curative instruction with regard to this comment. The defendant failed, however, to object to this comment and we have previously stated that "the defendant, by failing to bring [the improper comment] to the attention of the trial court, bears much of the responsibility for the fact that [this] claimed impropriet[y] went uncured. We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel [may not have] believe[d] that it was unfair in light of the record of the case at the time. . . . [We also recognize that] defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 269 Conn. 762–63. As we discussed previously, this comment caused minimal harm because it was fleeting. Accordingly, we conclude that the trial court's general instruction to the jury to not be influenced by "personal likes or dislikes, opinions, prejudices or sympathy" cured this remark's harmfulness.

Finally, we turn to the *Singh* violation. The trial court did not issue any specific curative instructions with regard to the question regarding whether the defendant stated that E had fabricated the allegations against the defendant. Rather, the trial court overruled defense counsel's objection to this line of questioning and denied the defendant's subsequent motion for a mistrial.[25] Nonetheless, the trial court did instruct the jury,

---

[25] The objection and motion for a mistrial were not predicated explicitly, however, on the *Singh* violation. Specifically, defense counsel objected to

both at the beginning of the trial and after closing arguments, that the jurors alone must determine witness credibility and the trial court enumerated specific factors to consider in making credibility determinations.[26] As we have discussed previously, *Singh* violations pose two risks: first, that such questions will invade the province of the jury; and, second, that the jury will conclude that to acquit the defendant it must determine that the other witness lied. *State* v. *Singh,* supra, 259 Conn. 707–708. As noted, the defendant, during closing argument, contended that E's testimony may have been fabricated, which minimized the harm resulting if, because of the *Singh* violation, the jury concluded that it must disbelieve E to acquit the defendant. Thus, we need be concerned only with the risk that the *Singh* violation invaded the jury's province as the sole judge of witness credibility. In light of the fact that there was only one question that violated *Singh*, that question did not ask the defendant explicitly if E was lying, and the defendant's response to that question was ambiguous, we

this line of questioning because the defendant "doesn't have to give a reason, and we don't have to give evidence, the burden isn't on us." In addition, defense counsel moved for a mistrial because "the prosecutor now has been suggesting that there's evidence about certain things, just through his questions, that there is not. . . . I think it's more prejudicial than probative and . . . I think, at this point, [the defendant] is being deprived of fairness in the process."

[26] The trial court's instruction to the jurors with regard to witness credibility stated: "[Y]ou must decide which testimony to believe and which testimony not to believe. You may believe all, none, or any part of any witness' testimony. In making that decision, you may take into account a number of factors including the following . . . Number one, was the witness able to see or hear or know the things about which that witness testified; two, how well was the witness able to recall and describe those things; three, what was the witness' manner while testifying; four, did the witness have an interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case; five, how reasonable was the witness' testimony considered . . . in light of all the evidence in the case; and six, was the witness' testimony contradicted by what that witness has said or done at another time or by the testimony of other witnesses or by other evidence."

conclude that the court's general instruction on witness credibility was sufficient to cure any possible danger that this question invaded the jury's province as sole arbiter of witness credibility. As we stated previously, "[i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions." (Internal quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 413. Indeed, in the present case, the jury's request, during deliberations, to rehear E's testimony indicates that the jurors were determined to make their own credibility determinations. See *State* v. *Vasquez*, 79 Conn. App. 219, 242, 830 A.2d 261 (concluding that jury's request to reevaluate witness testimony demonstrates that they were not influenced by prosecutor's statements, but were determined to make own credibility determinations), cert. denied, 266 Conn. 918, 833 A.2d 468 (2003).[27]

In sum, we conclude that, although the state's case was reliant on E's credibility, the one instance of misconduct that was central to the issue of credibility was not severe and was cured by the trial court's general instructions, and that the other instances of misconduct were either not severe or were cured by the trial court's prompt curative instructions. We therefore conclude that the defendant was not deprived of his due process right to a fair trial.

---

[27] On the basis of our conclusion that the lone *Singh* violation was cured by the trial court's general instructions, we conclude that the defendant's claim that the trial court abused its discretion in overruling his objection to the challenged question also must fail. While the trial court improperly overruled the defendant's objection, the defendant did not suffer any substantial prejudice or injustice. See *State* v. *Thompson*, supra, 266 Conn. 454 ("evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice" [internal quotation marks omitted]).

## III

## SUPERVISORY AUTHORITY

The defendant asserts, as an alternate ground for affirmance of the Appellate Court's judgment,[28] that this court should invoke its supervisory authority over the administration of justice to require a new trial.[29] The defendant contends that two reasons justify this court's invocation of its supervisory authority: first, the prosecutor violated the trial court's ruling not to attack the character of the defendant and E's mother; and, second, the prosecutor has engaged in a pattern of misconduct in the course of a number of trials. We decline to exercise our supervisory authority in the present case.

"[W]e may invoke our inherent supervisory authority in cases in which prosecutorial misconduct is not so egregious as to implicate the defendant's . . . right to a fair trial . . . [but] when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . We have cautioned, however, that [s]uch a sanction generally is appropriate . . . only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal. . . . Accordingly, in cases in which prosecutorial misconduct does not rise to the level of a constitutional violation, we will exercise our supervi-

[28] Practice Book § 84-11 (a) provides in relevant part: "Upon the granting of certification, the appellee may present for review alternative grounds upon which the judgment may be affirmed provided those grounds were raised and briefed in the appellate court. . . ."

[29] As an additional alternate ground to affirm the Appellate Court's judgment, the defendant invites this court to adopt a new standard for reviewing claims of prosecutorial misconduct. Specifically, the defendant urges this court to adopt, under article first, §§ 8 and 9, of the constitution of Connecticut, a new standard under which, once the defendant establishes that prosecutorial misconduct occurred, the burden would shift to the state to prove that the misconduct was harmless beyond a reasonable doubt. We decline the defendant's invitation.

sory authority to reverse an otherwise lawful conviction only when the drastic remedy of a new trial is clearly necessary to deter the alleged prosecutorial misconduct in the future. . . . Thus, [r]eversal of a conviction under [our] supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Internal quotation marks omitted.) *State* v. *Spencer*, supra, 275 Conn. 190–91.

At the outset, we note that many of the interests to be considered in determining whether to exercise our supervisory power militate against exercising that power. First, the defendant was not seriously prejudiced by the prosecutor's misconduct. See part II of this opinion. Second, based on E's testimony that he experienced shame and difficulty in relating these allegations, a new trial very likely would expose him to additional emotional trauma. See *State* v. *James G.*, 268 Conn. 382, 424, 844 A.2d 810 (2004) (recognizing trauma that new trial would likely bring to victim of child sexual assault). Third, a new trial likely would pose problems of memory loss and witness unavailability because the alleged sexual abuse ended approximately twelve years ago.

We disagree with the defendant that this court should exercise its supervisory powers because the prosecutor violated or undermined an earlier ruling of the trial court by attacking the character of the defendant and E's mother. First, the prosecutor did not improperly attack the character of E's mother or the defendant. See part I B 2 of this opinion. In addition, we find it questionable whether the prosecutor violated a prior

court ruling with regard to his examination of the defendant. After attempting to ask the defendant about substance abuse, the trial court warned the prosecutor that this question concerning prejudicial and collateral matters put him "a half a step away from a mistrial." The trial court did not indicate that the prosecutor had violated any of its prior rulings.[30] Moreover, even if the question were considered to have violated a trial court ruling, we conclude that this one question was not "so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Internal quotation marks omitted.) *State* v. *Spencer,* supra, 275 Conn. 191.

Finally, we disagree with the defendant that the prosecutor's past misconduct in prior trials justifies exercising our supervisory authority in the present case. Despite the prosecutor's misconduct in prior cases, we conclude that it is inappropriate in the present case to exercise our judicial authority because the prosecutor's misconduct in the present case was not deliberate or highly offensive to the sound administration of justice, and the defendant suffered only minimal prejudice from the misconduct. Cf. *State* v. *Payne,* 260 Conn. 446, 463–66, 797 A.2d 1088 (2002) (reversing conviction under supervisory power because prosecutor engaged in seri-

[30] During the cross-examination of E's mother, the trial court prohibited the prosecutor from asking her about any treatment she underwent for substance abuse, but did permit questions regarding her alleged abuse of drugs or alcohol during the relevant time. The record does not clearly show that the prosecutor then violated this ruling in his later cross-examination of the defendant. As we discussed in part I B 2 of this opinion, the prosecutor's first question to the defendant about substance abuse, which was not interrupted by an objection, was restricted to the period of the alleged sexual assaults. The prosecutor's third question on this subject, which was interrupted by an objection, also seemed to be limiting itself to substance abuse during this time period. Finally, the prosecutor's second question, which also was interrupted by an objection, did not indicate, prior to the objection, that it would be limited to this time period, but it also did not suggest that the defendant underwent treatment for substance abuse.

ous and deliberate acts of misconduct that significantly prejudiced defendant, and prosecutor engaged in same types of misconduct in prior trials).

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.