STATE OF CONNECTICUT *v.* ROBERT
EUGENE THOMPSON
(AC 35134)

Lavine, Sheldon and Pellegrino, Js.

Argued May 16—officially released October 1, 2013

*Stephanie L. Evans*, assigned counsel, for the appellant (defendant).

*Matthew A. Weiner*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Stacey M. Miranda*, assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Robert Eugene Thompson, appeals from the judgment of conviction rendered against him after a jury trial on charges of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A); sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1); assault in the third degree in violation of General Statutes § 53a-61 (a) (1); and threatening in the second degree in violation of General Statutes § 53a-62 (a) (1). On appeal, the defendant claims that (1) the complainant gave inadmissible, unfairly prejudicial testimony against him, implicating him in the commission of similar crimes against other persons, and thereby violating his constitutional right to a fair trial; (2) the prosecutor violated his constitutional right to a fair trial by repeatedly referring to the complainant as the "victim," over defense counsel's persistent objections and in contravention of the trial court's repeated admonitions not to do so; and (3) there was insufficient evidence to sustain his conviction on the charge of kidnapping in the first degree, under the

rule of *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), and *State* v. *Sanseverino*, 291 Conn. 574, 969 A.2d 710 (2009). We disagree with each of the defendant's claims, and thus affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. At approximately 11 p.m. on November 14, 2008, as the complainant, V.D.,[1] was walking home from a visit to her son's house, she encountered the defendant walking toward her on Sherman Avenue in New Haven. V.D. and the defendant, who were not previously acquainted, introduced themselves to one another and struck up a casual conversation. The defendant told V.D. that he lived with his sister, a pastor,[2] who was currently recruiting people to join her church. For that reason, he asked V.D. if she was interested in meeting his sister. Because V.D. enjoyed attending church, she agreed to go with the defendant to meet his sister. V.D. and the defendant walked together to his sister's house, which was located on Willis Street in New Haven.

Upon arriving at the house, to which he had no key, the defendant left V.D. on the front porch while he walked to the side of the house to knock on a window. After rejoining V.D. on the porch, the defendant knocked on the front door, which was promptly answered by a young boy who unlocked it to let them inside.[3] Upon entering the house, V.D. and the defendant walked through a small hallway into the living room,

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] The defendant was referring to his cousin, Deborah Thompson-Savage. Thompson-Savage testified that she and the defendant "grew up close, as if [they] were [brother and sister]."

[3] Deborah Thompson-Savage, the defendant's cousin, stated that her eleven year old grandson lived in the Willis Street home with her and the defendant.

where the defendant told V.D. that his sister would join them. V.D. sat on the living room sofa while awaiting the arrival of the defendant's sister.

Shortly thereafter, however, the defendant returned to the living room alone, explaining that his sister would not be joining them because she was asleep. V.D. replied that if she could not meet the defendant's sister, she would be leaving. She then rose from the sofa and began to walk toward the front door. As she did so, however, the defendant positioned himself between her and the door, blocking her exit and stating that she "wasn't going nowhere." As they stood by the door, V.D. asked the defendant, "[W]hy?" The defendant responded by ordering her to "shut up" and take off her clothes. Again, V.D. asked the defendant, "[W]hy?" This time, the defendant responded by punching her in the nose, causing her to bleed. The defendant then pushed V.D. several times toward the living room. Although V.D. attempted to resist him, the defendant ultimately succeeded in pushing her back into the living room. There, while they were standing near the sofa, the defendant once again ordered her to undress. When V.D. initially balked, the defendant grasped a nearby object and warned her that if she refused to undress or she made any noise, he would kill her. Fearing for her life, V.D. acquiesced and undressed, while the defendant simultaneously removed his clothing. As V.D. stood naked at the edge of the sofa, the defendant struck her in the mouth, causing her to "[stand] there swallowing the blood." The defendant then tossed V.D. a shirt to wipe the blood from her face and ordered her to lie on the sofa. Afraid of the defendant, V.D. complied.

After V.D. lay down, the defendant ordered her to open her legs. When she did so, he lay down on top of her. As V.D. lay on her back, swallowing blood, the defendant forced her to engage in vaginal intercourse with him. When he was finished, he stood up and

ordered V.D. to lie with him on the floor. Once again, she complied. As the defendant and V.D. lay naked on the floor, the defendant restrained her by placing his arms around her waist. When she attempted to move away from him, the defendant restrained her further by pulling more tightly at her waist. As a result of the defendant's strong grasp, V.D. could only move one of her arms. While lying on the floor, V.D. noticed the defendant's pants lying nearby. In an attempt to discover his identity, she removed the wallet from his pants and took his social security card from the wallet. Eventually, when V.D. believed that the defendant was asleep, she moved his arm slightly. When he did not respond, V.D. stood up, dressed and went to the bathroom to wash her bloody face.

After leaving the bathroom, V.D. entered the bedroom of Deborah Thompson-Savage, the woman she believed to be the defendant's sister, and woke her, explaining: "[M]iss, Miss, I need your help, your brother told me that you [are] a minister and I need your help. . . . [Y]our brother raped me . . . ." Thompson-Savage immediately got up and accompanied V.D. into the living room, where she found the defendant lying naked on the floor. With V.D. standing behind her, clutching the back of her shirt, Thompson-Savage woke the defendant and asked him: "[W]hat did you do?" The defendant then rose and, upon seeing V.D., lunged toward her. Thompson-Savage blocked his lunge, however, and pushed V.D. toward the door, telling her to "go get help."

Fleeing the Willis Street house, V.D. ran to Dixwell Avenue, where she found a New Haven police officer. V.D. reported the sexual assault to the officer and gave him the defendant's social security card. To investigate V.D.'s claim, the officer drove her back to Willis Street, where she pointed out the defendant's sister's house. She was then transported to the Hospital of Saint Raphael, where she was treated for her injuries and a

sexual assault kit was performed on her. Subsequent laboratory analysis revealed that V.D. was a DNA contributor to blood found both in the bathroom sink of the Willis Street house, and on a sofa cushion, a polo shirt and a T-shirt found at that location. Laboratory testing of seminal fluid found on a sofa cushion in the house revealed that its DNA profile was consistent with the defendant's known DNA profile.

The defendant was later arrested in connection with this incident on four criminal charges: kidnapping in the first degree, sexual assault in the first degree, assault in the third degree and threatening in the second degree. The defendant was ultimately tried by a jury and found guilty on all four charges. The court rendered judgment accordingly, sentencing the defendant on those charges to a total effective term of forty-five years incarceration, execution suspended after thirty-five years, followed by ten years probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that V.D. gave inadmissible, prejudicial testimony against him, implicating him in similar crimes against other persons, in violation of his constitutional right to a fair trial. Specifically, the defendant argues that V.D.'s unsolicited testimony that he had told her she "[was] not the first person . . . he [had] done this to" constituted inadmissible and highly prejudicial evidence, and, accordingly, that "due process requires that the defendant be given a new trial." Furthermore, to the extent that this claim is unpreserved, the defendant requests that we review it under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). In response, the state argues that the defendant waived this claim before the trial court "because he failed to seek any curative measures when the issue of

V.D.'s statement was discussed in the trial court and, instead, acquiesced in the trial court's handling of the matter." Concluding, as we do, that the defendant effectively waived this claim, we decline to review it on the merits.[4]

The following additional facts are relevant to our resolution of this claim. During the course of her treatment at the Hospital of Saint Raphael, V.D. was interviewed by Officer Wendy Barrett of the New Haven Police Department. In her recorded statement to Barrett, V.D. reported that the defendant had told her "that he has done this before and done this to all his women." On December 3, 2010, prior to the state's case-in-chief, the defendant filed a motion in limine, seeking to preclude the statement as evidence of uncharged misconduct.[5] The defendant argued, inter alia, that the prejudicial impact of the statement outweighed its probative value. The state countered by arguing that the statement. was "admissible as an admission by the defendant . . . ."

Initially postponing its ruling on the motion when it was first discussed on the eve of trial, the court stated: "[T]his is going to be, obviously, an offer of proof that I'm going to hear, I'm assuming . . . . If I understand the state's attorney, which is, it's anticipated that [V.D.] . . . would testify that the defendant indicated to her he has done this before or words to that effect? . . .

---

[4] In the alternative, the defendant claims that his conviction should be reversed pursuant to the plain error rule. See Practice Book § 60-5. Because we conclude that the defendant waived his claim as to V.D.'s testimony, plain error does not apply. See *State* v. *Corona*, 69 Conn. App. 267, 274–75, 794 A.2d 565 (plain error rule may only be invoked in instances of forfeited but reversible error and cannot be used for purpose of revoking otherwise valid waiver), cert. denied, 260 Conn. 935, 802 A.2d 88 (2002).

[5] During the hearing on the defendant's motion, defense counsel improperly characterized the defendant's prior statement as uncharged misconduct. The admission, however, was, in fact, a statement against penal interest. See Conn. Code Evid. § 8-6 (4).

Clearly, I can't make a ruling on that now; I don't know what's going to be said." The court then explained that when the state anticipated making an offer of proof as to the defendant's alleged statement, it should ask the court to excuse the jury. The court further stated that, at that time, it would hear the state's offer of proof and defense counsel's cross-examination of V.D., the parties would argue their positions, and the court would thereafter make a ruling on the defendant's motion.

Three days later, during the state's direct examination of V.D. on December 6, 2010, the following exchange occurred in the presence of the jury:

"[The Prosecutor]: . . . [W]hat happened when [the defendant] hit you? What led him to hit you?

"[V.D.]: He told me to take my clothes off.

"[The Prosecutor]: Okay. And did you tell—

"[V.D.]: And—

"[The Prosecutor]: Did you—were you telling him no?

"[V.D.]: Yes.

"[The Prosecutor]: And what did you—what else did you say to him?

"[V.D.]: I asked him, why [are] you doing this to me, and he said, *I'm not the first person*—

"[Defense Counsel]: Objection.

"[V.D.]: *He [had] done this*—

"[The Court]: Hold on, hold.

"[V.D.]: *to.*

"[The Court]: Hold on, hold on.

"[Defense Counsel]: Objection.

"[The Court]: What's the objection? She's in the middle of an answer.

"[Defense Counsel]: This is—if I—may the jury be excused? This is an area we discussed previously." (Emphasis added.)

After the jury was excused, the state made an offer of proof during which V.D. testified, in relevant part, that "[the defendant] said . . . I'm not the first person he ever did this to." In response to this offer, defense counsel argued, as he had in his motion in limine, that the statement should be excluded pursuant to § 4-3 of the Connecticut Code of Evidence because its prejudicial impact outweighed its probative value. The prosecutor disagreed, arguing once again that the testimony should be admitted as "an admission of the defendant . . . ." After hearing arguments from both parties, the court ruled that the challenged statement would be excluded as unfairly prejudicial. Thereafter, the following discussion occurred:

"[The Court]: . . . Is there anything else on this point?

"[Defense Counsel]: No, I believe that—I'm assuming the court would—I believe [V.D.] started her response and—

"[The Court]: Well, no, she got maybe two words out that—

"[Defense Counsel]: Okay. Okay.

"[The Court]: Quite frankly, I didn't even understand [what V.D. had started to say], and I don't mean to be—in other words, so, I'm—the court is very confident, [defense counsel], the jury did not hear anything, and you stood up right away."

On the basis of our review of the record, no further action was ever sought or taken regarding this issue.

Thus, at no point did defense counsel request a curative instruction or seek a mistrial on the basis of V.D.'s testimony. Of special note, moreover, defense counsel never indicated any disagreement with, much less challenged or asked for reconsideration of, the court's finding that the jury had not heard V.D.'s unsolicited, nonresponsive testimony about the defendant's statement.

On appeal, the defendant argues that he "was denied his right to due process and a fair trial when [V.D.] gave inadmissible and unfair, prejudicial testimony in front of the jury that implicated the defendant in other crimes." The defendant claims that "this issue was properly preserved for appellate review when the defendant filed a motion in limine, when the court heard the motion and when defense counsel objected to this particular line of inquiry during the complainant's testimony and the court ruled that the statement '[was] too prejudicial [and that it] would not allow [V.D.] to state that . . . to the jury.' " We disagree.

It is well settled that "[o]ur case law and rules of practice generally limit this court's review to issues that are distinctly raised at trial. . . . Only in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 579, 916 A.2d 767 (2007). "[W]aiver is [t]he voluntary relinquishment or abandonment—express or implied—of a legal right or notice. . . . In determining waiver, the conduct of the parties is of great importance. . . . [W]aiver may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Thus, [w]aiver . . . involves the idea of assent, and assent is an act of

understanding." (Internal quotation marks omitted.) *State* v. *McLaughlin*, 135 Conn. App. 193, 198, 41 A.3d 694, cert. denied, 307 Conn. 904, 53 A.3d 219 (2012).

Here, although the defendant filed a timely motion in limine to preclude evidence of his challenged statement to the complainant, and he reasonably expected from the court's initial discussion of the motion that the statement would not be published to the jury unless and until the court ruled it admissible after hearing argument from the parties outside the presence of the jury, defense counsel took insufficient steps to preserve any claim of prejudice arising from the jury's possible exposure to the statement when V.D. unexpectedly mentioned it before it was ruled inadmissible. This is because, after objecting to the statement as soon as V.D. mentioned it, defense counsel took no further action to establish that the jury had in fact heard it or to eliminate any prejudice that may have arisen from any such exposure. Thus, in the hearing on the admissibility of the statement immediately following his objection, defense counsel never questioned the trial court's express finding that the jury had not in fact heard V.D.'s testimony about the statement. Nor, in light of counsel's express acquiescence in the court's finding on that subject, did counsel seek to cure any prejudice that might have arisen had the jury in fact heard it, either by moving to strike the statement, requesting a curative instruction with respect to it or moving for a mistrial. Against this background, the defendant's present claim that he was deprived of his right to a fair trial by the jury's exposure to the challenged statement was waived by defense counsel's acquiescence in the trial court's finding that the jury never heard it. The defendant therefore has failed to preserve this claim. See *State* v. *Barber*, 64 Conn. App. 659, 670, 781 A.2d 464 ("defendant may not pursue one course of action at trial for tactical reasons and later on appeal argue that the path he rejected

should now be open to him" [internal quotation marks omitted]), cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001); see also *State* v. *Paredes*, 139 Conn. App. 135, 141–45, 54 A.3d 1073 (2012) (claim that jury's exposure to complainant's statement to third party witness that defendant had raped her violated defendant's constitutional right to fair trial was waived by defense counsel's acquiescence in trial court's resolution of matter by giving of curative instruction).

Here, then, because the defendant's claim is unpreserved, we must turn to the defendant's fallback position that the claim can be reviewed under *Golding*. Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

Here, the defendant's claim fails under both the second and the third prongs of *Golding*. The claim fails under the second prong of *Golding* because its true nature is evidentiary rather than constitutional. A defendant cannot transform an evidentiary claim into a constitutional claim merely by labeling it constitutional. The claim also fails under the third prong of *Golding* because, even if the witness' challenged testimony could have been objected to on constitutional grounds at trial, the defendant affirmatively waived any claim,

constitutional or otherwise, based upon it by acquiescing in the trial court's finding that the jury never heard it. When a party affirmatively waives a claim at trial, we generally do not afford review of that claim on appeal under *Golding. State* v. *Bharrat*, 129 Conn. App. 1, 17, 20 A.3d 9, cert. denied, 302 Conn. 905, 23 A.3d 1243 (2011). Thus, in *State* v. *Fabricatore*, 281 Conn. 469, 482, 915 A.2d 872 (2007), our Supreme Court held that "unpreserved, waived claims, fail under the third prong of *Golding* . . . ." Under the foregoing authorities, and on the basis of the record before this court, we decline to review the defendant's present claim under *Golding* because we conclude that it is a nonconstitutional claim which he affirmatively waived at trial.

## II

The defendant next claims that the prosecutor's repeated references to V.D. as the "victim" throughout his trial, despite the court's repeated admonitions that the prosecutor not do so, constituted prosecutorial impropriety.[6] Specifically, the defendant argues that, over the course of his trial, the prosecutor referred to V.D. as the "victim" on seven occasions,[7] thereby depriving him of his right to a fair trial. On the record

---

[6] Although the defendant appears to raise this issue as a claim that the trial court abused its discretion in denying the defendant's motions for a mistrial, which were based on the prosecutor's repeated reference to V.D. as the "victim," he analyzes the claim solely in terms of prosecutorial impropriety. Because "[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly"; (internal quotation marks omitted) *State* v. *Elson*, 125 Conn. App. 328, 360, 9 A.3d 731 (2010), cert. granted on other grounds, 300 Conn. 904, 12 A.3d 572 (2011); we address this claim as one of prosecutorial impropriety.

[7] In support of his claim of prosecutorial impropriety, the defendant identifies an eighth instance of improper use of the word "victim," when Officer Elliott Rosa of the New Haven Police Department referred to V.D. as the "victim" during his testimony. Defense counsel objected to Rosa's use of the word, and the trial court struck that portion of Rosa's testimony. A witness' use of the word clearly does not constitute prosecutorial impropriety.

before us, in light of the trial judge's commendably assiduous, effective efforts to correct the prosecutor's misstatements and refocus the jury on the true nature of its independent fact-finding responsibilities in this case, we are not persuaded.

The following additional facts are relevant to this claim. On December 6, 2010, during the state's direct examination of Officer Elliott Rosa of the New Haven Police Department, the following exchange occurred:

"[The Prosecutor]: . . . And when you arrived at St. Raphael's Hospital, did you meet with the victim?

"[Rosa]: Yes.

"[The Prosecutor]: Okay.

"[Defense Counsel]: Objection again. I'm going to object to the use of the phrase, victim.

"[The Court]: Yes, that'll be stricken. It's—

"[The Prosecutor]: I'm sorry.

"[The Court]: It's okay. It's the complainant.

"[The Prosecutor]: All right. I apologize."

Later that day, during the state's direct examination of Thompson-Savage, the prosecutor asked her: "Do you know . . . [d]id he come out at any time when you were out in the living room with the victim?" Upon the timely objection of defense counsel, the court excused the jury. Defense counsel then requested that the prosecutor refrain from referring to V.D. as the victim, arguing that, by so doing, she was implying that a crime had in fact occurred and that the defendant had committed it. The trial court agreed that the prosecutor's use of the term "victim" was improper. Thus, when the jury returned to the courtroom, the court gave the following curative instruction: "Ladies and gentlemen, just one brief comment before we get into the

cross-examination. From time to time today, you have heard V.D., who is the complaining party here, referred to as the victim. That was inadvertent. She's to be referred to as the complainant, not as the victim, okay? So, I just want to make sure you're aware of that. And I'll instruct you on that when I give my closing remarks to you. She is not a victim. She is a complaining party in this particular matter."

On the following day, December 7, 2010, during the prosecutor's direct examination of Officer Barrett, the following exchange took place:

"[The Prosecutor]: Is that—is that the victim's clothing?

"[Barrett]: Yes, it is.

"[Defense Counsel]: Objection, Your Honor. I'm going to object to the use of the word victim. May the jury be excused?

"[The Prosecutor]: I'm sorry."

Outside the jury's presence, defense counsel made an oral motion for a mistrial, arguing that the prosecutor's repeated use of the word victim in reference to the complainant had violated his client's due process rights. In response, the prosecutor apologized once again for her actions, explaining that she had not been using the word intentionally, and thus requesting that, despite her admitted error, the court deny the defendant's motion. The prosecutor further requested that the court give a curative instruction to the jury, explaining that her use of the term "victim" had been involuntary. The court thereupon denied the defendant's motion for a mistrial and, upon recalling the jury to the courtroom, gave it another curative instruction as follows: "Ladies and gentlemen, I'm going to give you what we call a curative instruction about the issue of complainant and V.D. I'm also going to give it to you when I do a final

charge to you, but if you could just please listen up? Over the course of the trial, you may have heard the complaining witness, who's V.D., referred to as the victim. This is improper. It is your duty and yours alone to determine, after careful evaluation of the facts presented to you, whether a crime has occurred in this case. You are to give absolutely no weight to the use of the word victim by any of the witnesses or lawyers. It is not meant to signal to you that a crime has occurred and that V.D. is indeed a victim. That is entirely for you to determine, okay? Thank you."

Shortly thereafter, however, still during the state's direct examination of Barrett, the prosecutor again referred to V.D. as the "victim," which led to the following colloquy before the jury:

"[Defense Counsel]: Objection.

"[The Court]: Counsel, counsel, it's V.D. or complainant.

"[The Prosecutor]: I'm sorry. Okay, sorry.

"[The Court]: All right.

"[The Prosecutor]: From the—I don't know why I keep doing that."

Later that same day, outside the presence of the jury, defense counsel renewed his motion for a mistrial, which the court denied as follows: "Well, listen, there's no doubt in my mind it's inadvertent, it's not intentional . . . I have [given] a limit[ing] instruction. I will give a final charge on that also. And I think the charge speaks for itself . . . that it is inadvertent, so I will deny your request [for a mistrial]."

Thereafter, on the third day of trial, December 8, 2010, during her cross-examination of the defendant, the prosecutor again referred to V.D. as the "victim." When defense counsel objected, the prosecutor

responded: "I'll strike that, I'm sorry." The court then stated, sua sponte: "Just again, hold on, ladies and gentlemen, V.D. is referred to as the complainant, as I indicated to you before, and I again will remind you in my final instructions. And, counsel, please don't repeat that."

Once more, however, during her cross-examination of the defendant, the prosecutor used the word victim, prompting defense counsel to object and to ask that the jury be excused. Once the jury was excused, defense counsel renewed his motion for a mistrial, to which the prosecutor responded as follows: "I don't know why I keep using [the word victim]. I'd ask that Your Honor— I could just stress the curative instruction again—if you want to instruct them again. And I—again, I—it's inadvertent, I'm not doing it intentionally . . . ." The court then stated: "I'm not going to grant the request for a mistrial. I will again tell them—I'll give them another curative and I'll give them a final—but this court is frustrated . . . with you. It is going on far too often, and it's—all I can say is, you better be very careful if it happens again." When the jury returned to the courtroom, the court reissued its curative instruction, criticizing the prosecutor for her improper statements and reminding the jurors of their independent fact-finding responsibilities in even stronger terms as follows: "I, again, will remind you that V.D. is referred to as— either as V.D. or as the complainant and not referred to what is—[the prosecutor] has referred to the complainant as, so you're to disregard that. It's the obligation of the state—as you know, the burden of proof is upon the state to prove the allegations in this information. So, the [prosecutor] is wrong, and it's improper to refer to V.D. in the term she uses. I have instructed her several times, and I'm going to continue to instruct her on that. And you will be hearing an instruction from me when we get to the final charge."

One final time, during the prosecutor's closing argument, she used the term "victim" despite the court's repeated instructions not to do so:

"[The Prosecutor]: You [could] consider, what is [the defendant's] motive for testifying the way he did. And you could also consider, what's the victim's motive? Ask yourself—

"[Defense Counsel]: I'm—

"[The Prosecutor]: It's the complainant's motive. What is V.D.'s motive in testifying?"

At the conclusion of closing arguments, defense counsel renewed the defendant's motion for a mistrial, which the court again denied.

In its final charge to the jury, the court gave the following relevant instruction: "Now, over the course of this trial, you may have heard the complaining witness, V.D, the complainant, referred to as a victim. This was . . . improper. It is your duty and yours alone to determine, after a careful consideration of all the facts presented to you whether a crime has occurred in this case. You are to give absolutely no weight to the use of the word [victim] by any of the witnesses or by [the prosecutor], who did that several times, obviously. It is not meant to signal to you that a crime has occurred and that V.D. is indeed a victim. That is entirely for you to determine."

"Our standard of review [with respect to claims of prosecutorial impropriety] is well settled. [I]n analyzing [such] claims . . . we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . [O]ur determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights

is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . [W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Citation omitted; internal quotation marks omitted.) *State* v. *Kurrus*, 137 Conn. App. 604, 618–19, 49 A.3d 260, cert. denied, 307 Conn. 923, 55 A.3d 566 (2012).

"Our Supreme Court has stated that a court's repeated use of the word victim with reference to the complaining witness is inappropriate when the issue at trial is whether a crime has been committed. . . . A different set of circumstances exists [however] when the person making [such a] reference to the complaining witness is the prosecutor." (Citation omitted.) *State* v. *Rodriguez*, 107 Conn. App. 685, 701, 946 A.2d 294, cert. denied, 288 Conn. 904, 953 A.2d 650 (2008). This is so, our courts have held, for two basic reasons. First, although a prosecutor's reference to the complainant as the "victim," in a trial where her alleged victimization is at issue, risks communicating to the jury that the prosecutor personally believes that she in fact is a victim, and thus the defendant is guilty of victimizing her, the isolated or infrequent use of that term in a trial otherwise devoid of appeals to passion or statements

of personal belief by the prosecutor will probably be understood by jurors to be consistent with the prosecutor's many proper references to the complainant as the complainant or the alleged victim, particularly where the prosecutor openly acknowledges and willingly accepts the state's burden of proving the defendant guilty beyond a reasonable doubt solely on the basis of the evidence admitted at trial. Second, when a prosecutor uses that term in argument, where his or her role is generally expected and understood to be that of an advocate, such isolated or infrequent references to the complainant as the "victim" are likely to be understood by jurors as parts of a proper argument that the evidence has established the complainant's victimization, and thus the defendant's guilt, beyond a reasonable doubt. In either of those circumstances, the prosecutor's use of the term "victim" in reference to the complainant is not considered improper because such usage does not illicitly ask the jury to find the defendant guilty on the basis of the prosecutor's personal belief in the complainant's victimization or the defendant's guilt.

Notwithstanding our courts' willingness, in the previously described circumstances, to excuse a prosecutor's rare and infrequent use of the term "victim" to describe the complainant in a criminal trial, our Supreme Court has expressly admonished prosecutors to refrain from making excessive use of that term because of its obvious potential for prejudice. Thus, in *State* v. *Warholic*, 278 Conn. 354, 370 n.7, 897 A.2d 569 (2006), where the court upheld the defendant's conviction despite the prosecutor's two unobjected-to references to the complainant as the victim during his rebuttal closing argument, the court warned prosecutors as follows: "We caution the state, however, against making excessive use of the term 'victim' to describe a complainant when the commission of a crime is at issue because prevalent use of the term may cause the

jury to draw an improper inference that the defendant committed a crime against the complainant." Consistent with that warning, the Supreme Court later, in *State* v. *Victor O.*, 301 Conn. 163, 20 A.3d 669, cert. denied, 565 U.S. 1039, 132 S. Ct. 583, 181 L. Ed. 2d 429 (2011), made the following, telling observation when affirming a conviction despite the prosecutor's one-time use of the term "victim" in a case where the trial court had denied the defendant's motion in limine to prevent any use of that term at all: "We note," said the court, "that, although the trial court had denied the defendant's motion in limine to preclude the state from using the term 'victim' when referring to [the complainant], the state's attorney *prudently avoided* the use of that term except on the one occasion that the defendant has identified." (Emphasis added.) Id., 191 n.11. Under these authorities, in order to avoid the risk of prejudice naturally arising from a prosecutor's reference to the complainant as the victim—a usage which our Supreme Court has expressly urged prosecutors, out of prudence, to avoid in any case where the issue is whether or not a crime was committed—a trial court obviously has the power to order a prosecutor not to use the term "victim" in reference to the complainant during trial.

Here, the prosecutor used the word "victim" in reference to the complainant on seven occasions, each of which was subject to a timely defense objection which the court promptly sustained without opposition by the state. Several repetitions of such references led to curative instructions by the trial court, some requested and others given sua sponte, and, ultimately, to defense motions for a mistrial. Although each motion for a mistrial was denied, none was denied on the basis that the prosecutor's use of the term victim had been proper. In fact, each such usage, except perhaps the first, was clearly improper because it was preceded by one or

more judicial rulings expressly describing the prosecutor's use of it as improper, explaining why it was improper, directing the jury not to be influenced by it, and instructing the prosecutor to avoid its repetition in the future. The state's belated contention, made for the first time on appeal, that the seven challenged references were not improper because they were relatively few in number and, in any case, they were inadvertent, is not persuasive on either ground advanced. The argument that such references were not improper because there were too few of them to constitute excessive use, within the meaning of *Warholic*, ignores the important distinguishing fact that the trial court had repeatedly ruled them to be improper and instructed the prosecutor not to use them, yet the prosecutor, unaccountably even to herself, could not restrain herself from repeating them. We have found no case, in Connecticut or elsewhere, in which a lawyer has repeated the same impropriety on so many occasions in a single trial despite repeated judicial instructions not to do so.

The state's alternative suggestion that the prosecutor's serial repetitions of such references did not constitute improprieties because, as the trial court found, they were inadvertent, conflates the concept of impropriety with that of misconduct. In the modern era, our courts have largely avoided using the term misconduct in discussing the pernicious effects of prosecutorial improprieties because the ultimate measure of the fairness of a defendant's trial is the likely effect of the prosecutor's potentially prejudicial conduct upon the jury rather than the intent with which the prosecutor engaged in such conduct. Where, then, as here, a prosecutor's repeated references to the complainant as the victim, in violation of the court's instructions, could theoretically have been understood to constitute statements of personal belief as to the complainant's victimization, and thus the defendant's guilt, they constituted improprieties whose

likely impact on the fairness of the defendant's trial must be assessed under the *Williams* factors, regardless of the mental state with which they were uttered.

Turning, then, to the second part of our inquiry on appeal as to the defendant's claim of prosecutorial impropriety, we must determine if the prosecutor's multiple references to the complainant in this case as the victim, despite the trial court's repeated orders that she not do so, were so egregious that they amounted to a denial of due process. Under *Williams*, many factors must be looked to in making that inquiry. First, we must determine if the defendant or his counsel contributed to the error he now complains of either by engaging in conduct that invited the prosecutor's improprieties or by failing to object to them when they occurred. Here, there is no question that neither the defendant nor his counsel did anything to invite the prosecutor's improper references to the complainant as the victim. Counsel, moreover, seasonably objected to such improper references with great diligence every time the prosecutor repeated them. The defendant therefore cannot be held responsible for the improprieties of which he now complains.

Second, we must examine the severity of the improprieties, together with their frequency and their centrality to the critical issues in the case. These factors all affect the likelihood that the jury actually heard the improprieties when the prosecutor engaged in them, later remembered such improprieties when conducting its deliberations at trial, and was influenced by them in the same prejudicial manner that the trial court sought to avoid by sustaining objections to them. Here, for reasons already noted in discussing why the prosecutor's repeated references to the complainant as the victim constituted improprieties, we conclude that the challenged references were indeed frequent, especially when considered in light of the trial court's numerous

prior rulings sustaining objections to them, admonitions to the prosecutor not to repeat them and instructions to the jury to ignore them. The improprieties, moreover, went to the central issue in this case, which was whether or not the complainant had indeed been victimized by the defendant in the manner described in her testimony. On the other hand, we conclude that although the prosecutor improperly failed on multiple occasions to curb her almost reflexive use of the term victim in reference to the complainant, such repeated references did not constitute a severe impropriety, as measured by their likely impact upon the jury when it conducted its deliberations. There are two basic reasons for the latter conclusion.

First, the manner in which the prosecutor engaged in such improprieties was not suggestive of any intent on her part to evade the court's rulings in an effort to communicate her personal belief to the jury that the complainant was indeed a victim and that the defendant was guilty of victimizing her. She apologized for most of her misstatements and invariably agreed with the court, in the presence of the jury, that her usage of the term victim had been in error. The prosecutor's words, it must be added, were not accompanied by other expressions of opinion as to the defendant's guilt, but were mostly ill-chosen short-form references to the complainant, whom she most commonly referred to during trial as the complainant or the female, or by her initials, V.D.

Second, the trial court's careful responses to the prosecutor's improper references and defense counsel's immediate objections to them utterly neutralized any lingering potential they might otherwise have had to communicate to the jury that the prosecutor believed the defendant to be guilty as charged. Each of the court's rulings on the defendant's timely objections was quick, to the point and very clear. The court not only

sustained each objection without hesitation, but followed up its ruling with a corrective statement to the prosecutor as to how she should refer to the complainant in the future. Also, as previously noted, the trial court gave several curative instructions to the jury, carefully informing it on each occasion that the prosecutor's use of the term "victim" had been improper, and reminding it that the decision whether or not the complainant was in fact a victim, and thus whether or not the defendant was guilty of committing any crime against her, was the jury's alone to make, solely on the evidence presented at trial. In the end, by the time the trial court delivered its final curative instruction, the jury had been told that the prosecutor had committed an impropriety on five different occasions, and that it was their job alone to decide, based solely upon the evidence, whether the complainant was a victim and the defendant was guilty of committing any crime against her, on four different occasions. With those repeated rulings and instructions in mind, there is a far greater likelihood that the jury was left with the impression that the prosecutor was an inexperienced trial lawyer, unable to select her words as the law required, rather than a stubborn advocate seeking to convey to it her belief that the defendant was guilty as charged.

Accordingly, although the prosecutor's use of the term "victim" was not invited by the defendant or his lawyer, and its intrinsic potential for prejudice went to the central contested issue in this case, which was whether or not the defendant had forced himself sexually upon V.D., the trial court's unsparing efforts to neutralize the potential prejudice arising from the prosecutor's conduct were almost certainly successful. Because of those efforts, the defendant's right to a fair trial was stoutly protected by the trial court in the face of the prosecutor's repeated improprieties, not fatally

compromised as the defendant has claimed. Accordingly, we reject the defendant's claim that he is entitled to a new trial on the basis of such prosecutorial improprieties.[8]

## III

The defendant's final claim is that there was insufficient evidence to sustain his conviction of kidnapping in the first degree.[9] Specifically, he contends that the evidence adduced at trial with respect to the kidnapping of V.D. was insufficient to prove the mental state required for the commission of that offense, to wit: that at the time of his challenged conduct, he had the intent to inflict physical injury upon V.D. or abuse her sexually.[10] We are not persuaded.

The defendant was charged with kidnapping in the first degree in violation of § 53a-92 (a) (2) (A). At the conclusion of the state's case-in-chief, the defendant moved for a judgment of acquittal on the kidnapping

[8] The final factor routinely considered by this court in determining if a proven prosecutorial impropriety has violated the defendant's right to due process is whether the state's evidence against the defendant was overwhelming. In this hotly contested case, although it cannot be said that the evidence was overwhelming, the trial court's successful efforts to cure any potential prejudice arising from the prosecutor's improprieties defeat any possible claim that such improprieties compromised the defendant's right to a fair trial.

[9] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

[10] The defendant also argues that, at trial, the state limited the factual basis for the first degree kidnapping charge to the restraint that occurred after the sexual assault of V.D. on the sofa, when the defendant forced V.D. to the floor and held her there against her will. Because we conclude that the state adduced sufficient evidence at trial to prove that, at the time the defendant forced V.D. to the floor, he intended to physically injure or sexually abuse her, we need not reach this argument, or the additional issue of whether the defendant's initial restraint of V.D.—where, by use of force, he moved her from the entryway near the door to the living room sofa—was merely incidental to the sexual assault, which occurred thereafter.

count, arguing that there was insufficient evidence to make out that offense under *State* v. *Salamon*, supra, 287 Conn. 509, and *State* v. *Sanseverino*, supra, 291 Conn. 574. The court denied the motion.

The jury was charged on kidnapping in the first degree, in relevant part, as follows: "A person is guilty of kidnapping in the first degree when he abducts another person and restrains the person abducted with intent to inflict physical injury upon her or violate or abuse her sexually." The court further instructed the jury that "[i]t is alleged that the restraint used against V.D. was for the purpose of the above allegations. . . . Nevertheless, some interferences with the person's liberty may be necessary or incidental to these allegations. To establish the defendant's intent to prevent the liberation of V.D., independent from the intent to inflict physical injury or violate or abuse her sexually, the state must prove that the defendant intended to prevent [V.D.'s] liberation for a longer time or to a greater degree than that which would be necessary to commit these acts. In this regard, the defendant's intent to prevent [V.D.'s] liberation may be [manifested] by confinement or movement that is more than merely incidental to the other intended acts. In other words, if the confinement or movement . . . is so much a part of the . . . other conduct that it could not be accomplished without such restraint, then the requisite intent to prevent [V.D.'s] liberation has not [been] established."

The court additionally delineated several factors that the jury should consider in deciding whether the confinement of V.D. was of independent criminal significance, or whether it was merely incidental to concurrent criminal acts. These factors included: (1) "the nature and duration of the complainant's movement or confinement by the defendant"; (2) "whether that movement or confinement occurred during the commission of other conduct"; (3) "whether the

restraint was inherent in the nature of other conduct"; (4) "whether the restraint prevented the complainant from summoning assistance"; (5) whether the restraint reduced the defendant's risk of detection"; and (6) "whether the restraint created a significant danger or increased the complainant's risk of harm independent of that posed by . . . the other conduct."

"In reviewing a sufficiency of the evidence claim, we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 247 Conn. 616, 620–21, 725 A.2d 306 (1999).

"A person acts 'intentionally' with respect to a result . . . described by a statute defining an offense when his conscious objective is to cause such result . . . ." General Statutes § 53a-3 (11). Section 53a-92 (a) (2) (A) thus requires that when the defendant engaged in the conduct claimed to constitute the offense, it was his conscious objective to inflict physical injury upon V.D. or violate or abuse her sexually.

"It is well established that the question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime

charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence . . . . Intent may be and usually is inferred from [conduct. . . . Whether] such an inference should be drawn is properly a question for the jury to decide." (Citations omitted; internal quotation marks omitted.) *State* v. *Torwich*, 38 Conn. App. 306, 314, 661 A.2d 113, cert. denied, 235 Conn. 905, 665 A.2d 906 (1995). "[I]ntent may be inferred from the events leading up to, and immediately following, the conduct in question . . . the accused's physical acts and the general surrounding circumstances." (Internal quotation marks omitted.) *State* v. *Ayala*, 133 Conn. App. 514, 520, 36 A.3d 274, cert. denied, 304 Conn. 913, 40 A.3d 318 (2012). It matters not, in most cases, whether the actor harbored his criminal intent for any particular period of time prior to acting on that intent, or that he continued to harbor it for any particular period of time thereafter. What matters instead is that he had the requisite intent at the moment he engaged in the conduct claimed to constitute the crime. See *State* v. *Cooper*, 227 Conn. 417, 444, 630 A.2d 1043 (1993) (formation of specific intent does not require planning or premeditation, but rather, may be formed instantaneously).

"[A] defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime." *State* v. *Salamon*, supra, 287 Conn. 547. "[I]n order to establish a kidnapping, the state is not required to establish any minimum period of confinement or degree of movement. When that confinement or movement is merely

incidental to the commission of another crime, however, the confinement or movement must have exceeded that which was necessary to commit the other crime. [T]he guiding principle is whether the [confinement or movement] was so much the part of another substantive crime that the substantive crime could not have been committed without such acts . . . ." (Footnote omitted; internal quotation marks omitted.) Id., 546.

"Whether the movement or confinement of the victim is merely incidental to and necessary for [the commission of] another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was *not* merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury." (Emphasis in original.) Id., 547–48.

The defendant argues that there was no evidence presented at trial supporting the conclusion that when he restrained V.D. on the floor after sexually assaulting her, he did so with the intent to harm her further.[11] We disagree. Construing the evidence in the light most favorable to the state, the jury reasonably could have found that when the defendant forcibly ordered V.D. to lie with him on the living room floor, he intended to inflict additional physical injury upon her or violate or sexually abuse her further. Upon learning that the defendant's putative sister was asleep and would not be joining her and the defendant in the living room of the Willis Street house, V.D. attempted to leave. Thereafter, at the hands of the defendant, V.D. was punched in the nose, pushed several times, threatened, punched

---

[11] The defendant does not claim that the state failed to present sufficient evidence at trial demonstrating that he abducted and restrained V.D. See General Statutes § 53a-92 (a) (2) (A).

in the mouth, and raped. Moments after the sexual assault occurred, the defendant, still naked, ordered the defendant to lie with him on the floor beside the sofa. The defendant wrapped his arms around V.D.'s waist so that she could not move any part of her body except for one of her arms. When V.D. attempted to break free, the defendant pulled her tighter. Only after the defendant fell asleep, and she took his social security card from his pants pocket, was V.D. able to free herself from his control, get dressed and wash her bloody face, and report to Thompson-Savage what the defendant had just done to her. Thereafter, Thompson-Savage roused the defendant, who still was asleep on the floor. Seeing V.D. standing behind Thompson-Savage, the defendant attempted to lunge past Thompson-Savage and grab V.D.

In light of the foregoing evidence, the jury reasonably could have found that the defendant, after committing the sexual assault upon V.D., restrained her next to him on the floor with the intent to further harm, violate or sexually abuse her. Such further restriction of her movements was surely not necessary to consummate his initial assault or sexual assault of her. Instead, by reasonable inference, the defendant imposed such further restraint upon her with other purposes in mind. As she and the defendant were still naked, and he had made it clear to her, by pulling her more tightly to him when she first attempted to get away after he raped her, that he was not yet finished with her, the jury reasonably could have found that he intended to violate her further when he regained his strength. This inference, moreover, was strengthened by his effort to lunge for V.D. when he saw her standing behind Thompson-Savage after she awakened him. It matters not that the defendant ultimately fell asleep before he was able to effectuate his plan. Because intent may be gleaned from circumstantial evidence such as the events leading up

to and immediately following the moment at which the defendant moved and restrained V.D. on the floor; see *State* v. *Ayala,* supra, 133 Conn. App. 520; the jury reasonably could have found that the defendant intended to inflict physical injury upon V.D. or violate or abuse her sexually at the time of the charged conduct. We conclude, therefore, that there was sufficient evidence to support the jury's finding that the defendant was guilty of kidnapping in the first degree.

The judgment is affirmed.

In this opinion PELLEGRINO, J., concurred.

LAVINE, J., concurring. A prosecutor's excessive use of the word "victim" is objectionable when the commission of a crime is at issue "because prevalent use of the term may cause the jury to draw an improper inference that the defendant committed a crime against the complainant." *State* v. *Warholic,* 278 Conn. 354, 370 n.7, 897 A.2d 569 (2006); see also *State* v. *Victor O.,* 301 Conn. 163, 191 n.11, 20 A.3d 669, cert. denied, 565 U.S. 1039, 132 S. Ct. 583, 181 L. Ed. 2d 429 (2011). It is properly disfavored and can form the basis, depending on the circumstances, of a prosecutorial impropriety claim.

It is, however, appropriate to note that while the word "victim" carries with it a distinct legal connotation when used in the setting of a trial against a particular criminal defendant, the word "victim" has a different, broader meaning when used in its colloquial sense. As our case law recognizes, juries understand that when the person making reference to the complaining witness is the prosecutor, the word "victim" is understood to mean "alleged victim." *State* v. *Smith,* 51 Conn. App. 589, 592, 724 A.2d 527 (1999). To put it another way, virtually everyone understands that in its everyday sense, a "victim" is someone against whom a crime has been committed, or, at the very least, someone who

claims that a crime has been committed against him or her. It is against this commonsense understanding of the word "victim," informed by decades of crime dramas, television reports, and high profile trials, that the prosecutor's repeated use of the word "victim" must be measured. Given the reality that the word "victim" carries this broader meaning, and that jurors readily understand that prosecutors, police, and others in the criminal justice system habitually use the word "victim" as shorthand for "alleged victim," I conclude that, while the use of the word "victim" is improper in cases in which there is a dispute as to whether a crime was committed, generally, its use is less likely to create a real injustice than other more weighty prosecutorial improprieties.

It is agreed—indeed, the trial court expressly concluded—that the prosecutor's use of the word "victim" in this case was inadvertent. As the majority noted, there is nothing whatever in the record to suggest that the prosecutor repeatedly used the word "victim" surreptitiously to express her personal opinion about the charges against the defendant or to gain an unfair tactical advantage. Given the facts of this case—particularly in light of the trial court's strong and effective curative instructions and the prosecutor's apologies—I conclude that the defendant suffered no harm whatever as a consequence of the prosecutor's unaccountable mistakes. I would go further. I would posit that the prosecutor's conduct, if it disadvantaged anyone at all in the jury's eyes, was injurious to the state because the jury must have been left to wonder why the prosecutor could not conform her conduct to the repeated instructions of the court.

For the foregoing reasons, I concur in the majority opinion.